PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SOUTH ATLANTIC LIMITED
PARTNERSHIP OF TENNESSEE, LP;
SOUTH ATLANTIC INCOME PROPERTIES,
LLC; SOUTH ATLANTIC MANAGEMENT
COMPANY,
           *Plaintiffs-Appellees,*

                    v.

DAVID R. RIESE; GARY PLICHTA,
           *Defendants-Appellants,*

                   and                          No. 02-2274

GIBRALTAR COMPANIES OF TENNESSEE,
INCORPORATED; GIBRALTAR
COMPANIES, INCORPORATED,
                        *Defendants,*

                    v.

E. STEPHEN STROUD; GRACE D.
RAMSEY; STEVE SIMPSON,
           *Third Party Defendants-
                        Appellees.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-96-901-5-H-1)

Argued: October 28, 2003

Decided: January 30, 2004

Before MOTZ, TRAXLER, and KING, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Sean Eric Andrussier, WOMBLE, CARLYLE, SAN-DRIDGE & RICE, P.L.L.C., Raleigh, North Carolina, for Appellants. Kenneth Ray Wooten, WARD & SMITH, P.A., New Bern, North Carolina, for Appellees. **ON BRIEF:** Pressly M. Millen, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Raleigh, North Carolina, for Appellants. E. D. Gaskins, Jr., EVERETT, GASKINS, HAN-COCK & STEVENS, Raleigh, North Carolina, for Appellees.

---

## OPINION

KING, Circuit Judge:

David Riese and Gary Plichta have initiated this appeal from an October 1, 2002, judgment entered by the district court. *South Atl. Ltd. P'ship of Tenn. v. Riese*, 5:96CV901H1 (E.D.N.C. Oct. 1, 2002). Riese and Plichta maintain that the 2002 judgment improperly modified the court's earlier May 6, 1999, judgment, which had been affirmed on appeal. *South Atl. Ltd. P'ship of Tenn. v. Riese*, 5:96CV901H1 (E.D.N.C. May 6, 1999); *aff'd by South Atl. Ltd. P'ship of Tenn. v. Riese*, 284 F.3d 518 (4th Cir. 2002) (hereinafter "SALT I"). As explained below, the 2002 judgment contravened the mandate rule, and we therefore vacate and remand.

I.

In order to determine whether entry of the 2002 judgment contravened our mandate in SALT I, we must understand the procedural history of this litigation. This procedural history can be, for organizational purposes, divided into three periods — the period prior to May 6, 1999 (the "Pre-Judgment" period); the period between May 6, 1999, and the issuance of the SALT I mandate on May 14, 2002 (the "Post-Judgment" period); and the period following issuance of the

SALT I mandate (the "Post-Mandate" period). Prior to reviewing this procedural history, we will briefly relate the relevant facts underlying this dispute.

A.

In the 1980s, David Riese and Gary Plichta (the "Riese Group") joined efforts to develop a multi-family residential community, known as Lexington Apartments (the "Lexington"), near Nashville, Tennessee. In 1993, in order to secure the capital necessary to develop the Lexington, the Riese Group joined forces with E. Stephen Stroud, Stroud's wife Grace Ramsey, and Steven Simpson (the "Stroud Group"). The Stroud Group and the Riese Group then formed a limited partnership, called South Atlantic Limited Partnership of Tennessee ("SALT" or the "Partnership"), to develop real estate in the Nashville area. The Partnership was structured so that SALT owned the Lexington. The Riese Group owned twenty-five percent of SALT, and the other seventy-five percent was controlled by the Stroud Group.

Rather than retain a third-party to oversee development of the Lexington, the Partnership authorized the Riese Group to form Gibraltar Companies of Tennessee, Incorporated ("Gibraltar")[1] to serve as its general construction contractor. SALT and Gibraltar entered into a general contractor agreement in August 1994, pursuant to which Gibraltar was required, *inter alia*, to achieve substantial completion of the Lexington within eighteen months of commencing construction.

The beginning of the Lexington's construction was delayed almost six weeks, and several additional delays occurred after construction commenced. In January 1996, citing concerns stemming from con-

---

[1]As in SALT I, two Gibraltar Companies — Gibraltar Companies of Tennessee, Incorporated and Gibraltar Companies, Incorporated — are defendants, but the general construction contractor was Gibraltar Companies of Tennessee, Incorporated. The distinction between the Gibraltar companies is immaterial to this appeal, and we refer to them both collectively and individually as "Gibraltar." SALT I at 523 n. 1.

struction quality and delays, SALT replaced Gibraltar with a new general contractor, and the Lexington was completed in August 1996.

Meanwhile, in January 1996, Prudential Insurance Company executed a letter of intent to purchase the Lexington. In May 1996, Stroud's attorney notified the Riese Group that an audit reflected that the Riese Group and Gibraltar had engaged in financial improprieties during construction of the Lexington. Stroud's attorney also informed the Riese Group that, as a result of these improprieties, it would be expelled from SALT on May 31, 1996. According to the Stroud Group, SALT's book value was less than zero at the end of May 1996. Pursuant to the partnership agreement, therefore, the Riese Group received nothing for its twenty-five percent ownership interest in SALT. On June 11, 1996, eleven days after the Riese Group was expelled from the Partnership, Prudential purchased the Lexington from SALT for $17,640,000, netting SALT a profit of approximately $1,200,000.

## B.

### 1. *THE PRE-JUDGMENT PERIOD*

In October 1996, SALT, along with its general partner (South Atlantic Income Properties, L.L.C.) and its majority limited partner (South Atlantic Management Company) (collectively, the "SALT Group"), filed suit against the Riese Group and Gibraltar in the Eastern District of North Carolina. The Riese Group and Gibraltar responded with counterclaims against the SALT Group and with third-party claims against the Stroud Group. The various claims in the lawsuit included breaches of contract, breaches of fiduciary duties, and violations of North Carolina's Unfair Trade Practices Act (the "UTPA"). SALT I at 524.

A jury trial was conducted in the Eastern District of North Carolina in November 1998. Upon its conclusion, the jury rendered its Verdict, finding: (1) that the Riese Group had breached its fiduciary duties to SALT; (2) that Gibraltar had breached its contractual obligations to SALT; and (3) that the SALT Group, the Stroud Group, the Riese Group, and Gibraltar had each engaged in unfair and deceptive trade practices. On November 19, 1998, the court entered judgment on the

Verdict.[2] On December 4, 1998, the Riese Group and Gibraltar moved the court, pursuant to Rules 59 and 60(a) of the Federal Rules of Civil Procedure, to correct certain clerical errors in the judgment. Specifically, they sought to amend the judgment to reflect that the breach of contract aspect of the Verdict related only to Gibraltar, rather than to all defendants, and that the Riese Group and Gibraltar's UTPA award was against the Stroud Group as well as the SALT Group. On March 10, 1999, in conformity with those requests, the court entered an Amended Judgment.

On March 24, 1999, the SALT and Stroud Groups sought, pursuant to Rule 60(a), to amend the judgment a second time. They sought to remove Gibraltar Companies, Incorporated, as a counter-claimant and third-party plaintiff in the Amended Judgment of March 10, 1999. They also sought to have the judgment reflect that they (the SALT and Stroud Groups) were jointly and severally liable for their UTPA violations, and that the Riese Group and Gibraltar were jointly and severally liable for their UTPA violations. Finally, the SALT and Stroud Groups requested the court to aggregate the SALT Group's total recovery in the judgment (i.e., aggregate its recovery of costs with its recovery for Gibraltar's breach of contract and the Riese Group's and Gibraltar's UTPA violations).

On March 29, 1999, the Riese Group and Gibraltar filed a cross-motion, pursuant to Rule 60(a), also seeking to amend the judgment for a second time. Although they agreed with certain of the amendments proposed by the SALT and Stroud Groups, they opposed the aggregation of the SALT Group's total recovery. The Riese Group and Gibraltar noted that the SALT Group's various awards were not rendered against the same parties. *See infra* note 5. They contended, therefore, that aggregating the claims "could be potentially confusing

---

[2]Because of the complexity of this litigation, the Verdict included ten pages of special interrogatories. Indeed, the trial judge observed that it "was one of the most complex cases I've run into now in more than a decade on the bench." The judgment entered on November 19, 1998, was the first of four judgments entered by the district court. An Amended Judgment was entered on March 10, 1999, and a Second Amended Judgment was entered on May 6, 1999. The most recent judgment (at issue in this appeal) was entered on October 1, 2002.

for court personnel (including state court personnel) attempting to deal with [the] judgment . . . ."

While the Rule 60(a) motions were pending, the parties proceeded to appeal various aspects of the Amended Judgment. The SALT and Stroud Groups filed their notice of appeal on April 9, 1999, and the Riese Group and Gibraltar filed a notice of appeal on April 22, 1999. On May 1, 1999, we consolidated these two appeals (Nos. 99-1497(L) and 99-1552, respectively).

## 2.  *THE POST-JUDGMENT PERIOD*

On May 6, 1999, while the two consolidated appeals were pending in this Court, the district court amended the judgment for a second time, entering its Second Amended Judgment. Despite the Riese Group and Gibraltar's objection to aggregation of the SALT Group's total recovery, the Second Amended Judgment provided that the SALT Group "collectively shall have . . . a total recovery, exclusive of interest, of $1,578,765.94."[3]

---

[3]The Second Amended Judgment, which we affirmed in SALT I, provided as follows:

> [P]laintiffs collectively [(i.e., SALT Group)] shall have and recover: (1) of defendant Gibraltar Companies of Tennessee, Inc., $1,100,000.00 for breach of contract, with interest at the State of North Carolina legal rate from January 17, 1996, until March 9, 1999, and interest at the federal legal rate from March 10, 1999 until paid; (2) plaintiffs collectively shall have and recover of defendants Gary Plichta and David Riese, jointly and severally, $1.00 for breach of fiduciary duty; with interest at the State of North Carolina legal rate from October 25, 1996 until March 9, 1999, and interest at the federal rate from March 10, 1999, until paid; (3) from all of the defendants [(i.e., the Riese Group and Gibraltar)], jointly and severally, $450,000.00 for unfair and deceptive trade practices plus interest on $150,000.00 at the State of North Carolina legal rate from October 25, 1996 until March 9, 1999, and interest on $450,000.00 at the federal legal rate from March 10, 1999, until paid; and (4) costs in the amount of $28,764.94; for a total recovery, exclusive of interest, of $1,578,765.94.

On May 14, 1999, eight days after entry of the Second Amended Judgment (the "Judgment"), the SALT and Stroud Groups moved the district court, pursuant to Rule 62(d), to stay the Judgment without requiring bond (the "Bond Motion"). On June 2, 1999, the Riese Group and Gibraltar filed a motion to stay execution of the Judgment pending appeal. In support of the Bond Motion, the SALT and Stroud Groups asserted that the two motions raised the issue of "how properly to treat [the Riese Group and Gibraltar's] recovery on their counterclaim to offset [the SALT Group's] recovery on [its] claims, for purposes of execution." They contended that the court should amend the Judgment again to adopt a net recovery approach to the various awards, that is, by: (1) aggregating the SALT Group's recovery with the Stroud Group's recovery; (2) aggregating the Riese Group's recovery with Gibraltar's recovery; and (3) setting off the Riese Group and Gibraltar's total recovery against the SALT and Stroud Groups' total recovery (the "Net Recovery Approach").

The SALT and Stroud Groups sponsored the Net Recovery Approach because, pursuant thereto, the recoveries of all parties other than the SALT Group would be eliminated by the awards rendered against them, and the SALT Group would receive a net recovery, exclusive of interest, of $678,765.94.[4] The Riese Group and Gibraltar

---

IT IS FURTHER ORDERED third-party plaintiffs collectively [(i.e., the Riese Group and Gibraltar)] shall have and recover of plaintiffs and third-party defendants [(i.e., the SALT Group and Stroud Group)], jointly and severally, $900,000.00 for unfair and deceptive trade practices, plus interest on $300,000.00 with interest at the State of North Carolina legal rate from February 28, 1997, until March 9, 1999, and interest on $900,000.00 at the federal legal rate from March 10, 1999, until paid; for a total recovery, exclusive of interest, of $900,000.

[4]The SALT and Stroud Groups' interest in the Net Recovery Approach apparently arose from two concerns. First, they recognized that, unless Gibraltar recovered some portion of the $900,000 awarded collectively to Riese, Plichta, and Gibraltar for the SALT and Stroud Groups' UTPA violations, Gibraltar, as a minimally capitalized corporation, may be unable to pay any of its $1.1 million breach of contract liability to SALT. The SALT and Stroud Groups wanted to ensure, therefore, that Riese and

responded to the Bond Motion by asserting that the court, in resolving the SALT Group's earlier Rule 60(a) motion, had already declined to adopt the aggregation proposal of the Net Recovery Approach. They contended that the SALT and Stroud Groups' inclusion of the allocation and setoff issue in the Bond Motion was simply an effort to relitigate an issue the court had already resolved. Concerned that the SALT and Stroud Groups would continue to pursue a net recovery theory, the Riese Group and Gibraltar requested the court to "issue an order that makes clear once and for all that Plaintiffs are not entitled to a 'net recovery' against Riese and Plichta."

On July 2, 1999, while the two consolidated appeals were pending in SALT I, the district court entered an order rejecting the Net Recovery Approach. *South Atl. Ltd. P'ship of Tenn. v. Riese*, 5:96CV901H1 (E.D.N.C. July 2, 1999) (hereinafter, the "Rejection Order"). In the Rejection Order, the court observed that it had "awarded a $900,000 judgment for Riese, Plichta and Gibraltar Companies of Tennessee against Stroud, Ramsey, Simpson and [SALT]."[5] The court also noted

---

Plichta, as the shareholders, directors, and principal officers of Gibraltar, were required to record the $900,000 judgment on Gibraltar's behalf. Second, the Stroud Group was concerned that, because it, along with the SALT Group, had been found jointly and severally liable for violating the UTPA, Riese and Plichta would choose to record the Judgment against the Stroud Group alone. And the Stroud Group understood that, without some form of aggregation, it would be unable to offset its UTPA liability against any recovery it received in the Judgment.

[5]The recoveries authorized under the Judgment (exclusive of costs and interest) are summarized in the following table:

| Recovering Party | Liable Party | Amount | Claim |
| --- | --- | --- | --- |
| SALT Group | Gibraltar | $1,100,000 | breach of contract |
| SALT Group | Riese Group | $1 | breach of fiduciary duty |
| SALT Group | Riese Group and Gibraltar | $450,000 | three UTPA violations |
| Riese Group and Gibraltar ("collectively") | SALT and Stroud Groups | $900,000 | two UTPA violations |

that "[t]here can be no 'net' recovery because separate defendants must pay the judgments of $1,100,000, $450,000 and $1.00." The Rejection Order provided that "[t]he only true 'net' recovery would be on the unfair and deceptive trade practices cross-claims between defendants' [sic] Riese, Plichta and [Gibraltar] and third-party defendants Stroud, Ramsey, Simpson and [SALT]." The court noted, however, that such a net recovery would favor the Riese Group and Gibraltar rather than the SALT and Stroud Groups.

On July 14, 1999, the SALT and Stroud Groups filed a notice of appeal from the Rejection Order. On July 22, 1999, they filed their docketing statement in SALT I, listing the issues they would raise on appeal. These issues included:

> 1.   Whether the offset for purposes of execution, as proposed by Appellants and disallowed by the District Court [(i.e., the Net Recovery Approach)], is appropriate?

> 2.   If not, *how should the judgment be applied for purposes of execution*?

(emphasis added). On August 2, 1999, we consolidated the SALT and Stroud Groups' appeal of the Rejection Order (No. 99-1987) with the consolidated appeals in SALT I.

On September 13, 2001, the SALT and Stroud Groups filed their brief in SALT I. Although their docketing statement asserted that they would raise the issue of how the Judgment should be applied for purposes of execution, that issue was not addressed. On October 30, 2001, when we heard argument in SALT I, the SALT and Stroud Groups did not raise or address the issue of how the Judgment should be applied for purposes of execution. On March 22, 2002, we issued our opinion in SALT I, affirming the Judgment "in all respects." SALT I at 542.

On April 9, 2002, the SALT and Stroud Groups filed a Petition for Rehearing with Rehearing En Banc (the "Petition"). In the Petition, they asserted that "the jury awarded ... $300,000 to the Riese Group," and that the result of the UTPA determination in SALT I "is

that the Riese Group stands to recover from the Stroud Group $450,000, plus interest." On May 6, 2002, we denied rehearing and rehearing en banc. On May 14, 2002, we issued our mandate in SALT I, affirming the Judgment.[6]

### 3.  *THE POST-MANDATE PERIOD*

On May 16, 2002, the Riese Group recorded its $900,000 judgment against the Stroud Group in Wake County, North Carolina. As the sole shareholders, directors, and principal officers of Gibraltar, however, the Riese Group did not record the judgment on Gibraltar's behalf. The following day, the SALT and Stroud Groups returned to the district court and sought relief pursuant to Rule 54(c),[7] requesting the court to adopt a net recovery approach to the UTPA awards by making the following allocations and setoffs:

> 1.  Allocate one-half of the $900,000.00 liability of [SALT] and the Stroud Group to Gibraltar and allocate the other one-half to Riese and Plichta; and

> 2.  Order that Gibraltar's entitlement to $450,000.00 is more than offset by its $1.1 million liability to [SALT] and order that Riese and Plichta's entitlement to $450,000.00 is offset by their liability of $450,000.00 to [SALT] . . . .

(the "UTPA Net Recovery Approach").

---

[6]Pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure, "[u]nless the court directs that a formal mandate issue, the mandate consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any direction about costs." We did not issue a formal mandate in SALT I. Our mandate of May 14, 2002, consisted of our Opinion and the Certified Copy of Judgment. *South Atl. Ltd. P'ship of Tenn. v. Riese*, Notice of Issuance of Mandate, 99-1497(L) (4th Cir. May 14, 2002).

[7]Pursuant to Rule 54(c) of the Federal Rules of Civil Procedure:

> Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled . . . .

On September 26, 2002, during a hearing on the Rule 54(c) motion, the SALT and Stroud Groups maintained that the Riese Group's recording of the $900,000 judgment in Wake County was contrary to the Judgment and our mandate. They noted that, although the Judgment provided that the third-party plaintiffs — the Riese Group and Gibraltar — shall *collectively* recover $900,000 from plaintiffs and third-party defendants, the Riese Group had not recorded the Judgment on behalf of Gibraltar. Counsel for the SALT and Stroud Groups contended that the $900,000 award made collectively to Riese, Plichta, and Gibraltar should be allocated among those parties. In response, the Riese Group maintained that the court was precluded by the mandate rule from amending the Judgment.[8] In addition, the Riese Group contended that the court lacked authority under Rule 54(c) to amend the Judgment.

On October 1, 2002, the district court granted the Rule 54(c) motion and entered its 2002 judgment (the "Post-Mandate Judgment"). The court therein allocated half of the $900,000 UTPA award to Gibraltar and half of that award to the Riese Group. The court then applied the UTPA Net Recovery Approach, offsetting the Riese Group's UTPA award against its $450,000 UTPA liability to SALT, and offsetting Gibraltar's UTPA award against its $1.1 million liability to SALT. Utilizing the UTPA Net Recovery Approach, the Post-Mandate Judgment provided for the following:

> (1) Judgment against Gibraltar and in favor of plaintiffs in the amount of $650,000; (2) Judgment against Riese and Plichta, jointly and severally, in favor of plaintiffs in the

---

[8]As the Second Circuit explained in *United States v. Ben Zvi*, the mandate rule "forecloses relitigation on issues expressly or *impliedly* decided by the appellate court." 242 F.3d 89, 95 (2d. Cir. 2001) (internal quotation marks and citations omitted) (emphasis in original). In addition, the court observed that:

> [W]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so.

*Id.*

amount of $1; and (3) Judgment against Riese, Plichta, and Gibraltar, jointly and severally, in favor of plaintiffs in the amount of $28,764.94.

On October 30, 2002, the Riese Group and Gibraltar filed a notice of appeal from the Post-Mandate Judgment. They contend on appeal that entry of the Post-Mandate Judgment contravened the mandate rule and that the district court lacked authority under Rule 54(c) to amend the Judgment affirmed in SALT I. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

A district court's interpretation of an appellate court's mandate is reviewed de novo. *See, e.g.*, *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1275 (Fed. Cir. 1999). We review de novo, therefore, whether a post-mandate judgment of a district court contravenes the mandate rule, or whether the mandate has been "scrupulously and fully carried out." 2A Fed. Proc., L. Ed. § 3:1016 (citing *Bd. of Supervisors of Wayne County v. Kennicott*, 94 U.S. 498 (1876)).

## III.

In this appeal, we must decide whether the district court's entry of the Post-Mandate Judgment violated the mandate rule, which has been characterized as a "more powerful version" of the law of the case doctrine. *LaShawn v. Barry*, 87 F.3d 1389, 1393 & n.3 (D.C. Cir. 1996) (en banc). As we observed in *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993), "[f]ew legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)). Under the mandate rule, a lower court generally may not consider questions that the mandate has laid to rest.[9]

---

[9]We have recognized certain limited exceptions to the mandate rule. In *Bell*, we observed that, in exceptional circumstances, a trial court may reopen an issue expressly or impliedly decided by the appellate court. *Id.* at 67. Such circumstances include:

(1) a showing that controlling legal authority has changed dramatically; (2) that significant new evidence, not earlier obtain-

*Sprague*, 307 U.S. at 168. In assessing whether the mandate rule has been contravened, we must determine whether the district court addressed a matter within the scope of our mandate.

In defining the scope of a mandate, we have observed that the mandate rule "forecloses litigation of issues decided by the district court but foregone on appeal or otherwise waived . . . ." *Bell*, 5 F.3d at 66. And we have held that "a district court must, except in rare circumstances, implement both the letter and the spirit of the . . . mandate, taking into account [our] opinion and the circumstances it embraces." *Id.* (internal quotation marks and citations omitted) (alteration in original). We have also held that the mandate rule "forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Id.* (citing *United States v. Bell*, 988 F.2d 247, 251 (1st Cir. 1993)). The mandate rule does not simply preclude a district court from doing what an appellate court has expressly forbidden it from doing. Under the mandate rule, a district court cannot reconsider issues the parties failed to raise on appeal; the court must attempt to implement the spirit of the mandate; and the court may not alter rulings impliedly made by the appellate court. *Id.*

The SALT and Stroud Groups maintain that, for two reasons, the Post-Mandate Judgment did not contravene the mandate rule. First, they contend that the Post-Mandate Judgment did not alter the Judgment, but rather that it *was* the Judgment, simply clarified. Second, the SALT and Stroud Groups maintain that the clarifications in the Post-Mandate Judgment were consistent with, rather than contrary to, our mandate in SALT I. In assessing whether the Post-Mandate Judgment contravened the mandate rule, therefore, we must answer the following inquiries. First, we must decide whether the Post-Mandate Judgment altered, or merely clarified, the Judgment. Second, if the Post-Mandate Judgment altered the Judgment, we must determine

---

able in the exercise of due diligence, has come to light; or (3) that a blatant error in the prior decision will, if uncorrected, result in a serious injustice.

*United States v. Aramony*, 166 F.3d 655, 662 (4th Cir. 1999) (quoting *Bell*, 5 F.3d at 67). The SALT and Stroud Groups make no claim of exceptional circumstances in this appeal.

whether the alteration was consistent with our mandate. We address these issues in turn.

## A.

The SALT and Stroud Groups maintain that the district court's entry of the Post-Mandate Judgment did not contravene the mandate rule because it merely clarified the Judgment. The Judgment provided that "third-party plaintiffs [(i.e., Riese, Plichta, and Gibraltar)] collectively shall have and recover of plaintiffs and third-party defendants, jointly and severally, $900,000.00 for unfair and deceptive trade practices . . . ." The SALT and Stroud Groups accurately contend that, although the Judgment indicates that the third-party plaintiffs (i.e., Riese, Plichta, and Gibraltar) should *collectively* recover $900,000, it does not allocate how much of the $900,000 each third-party plaintiff should receive. This fact does not, however, foreclose the proposition that the Post-Mandate Judgment impermissibly altered the Judgment.

It cannot be determined, relying solely on the language of the Judgment, how the $900,000 UTPA award should be allocated between the Riese Group and Gibraltar. The Riese Group maintains that, because the Verdict provided that the Riese Group (i.e., Riese and Plichta, not Gibraltar) suffered $300,000 in damages from the SALT and Stroud Groups' unfair and deceptive trade practices, the Riese Group should collect the trebled UTPA award (i.e., $900,000).[10] And the Riese Group contends that its collection of the $900,000 UTPA award would be consistent with the Judgment because, if it collected the $900,000, the Riese Group and Gibraltar would *collectively, as a group*, receive $900,000.

---

[10]There is support in the Verdict for allocating the entire $900,000 UTPA award to the Riese Group. The amount of a UTPA award is determined by trebling the damages suffered as a result of a UTPA violation. N.C. Gen. Stat. § 75-16. The issue of how the $900,000 UTPA award should be allocated, therefore, depends on which party or parties suffered the $300,000 in damages from the UTPA violations. The third interrogatory of the Verdict asked, "[W]hat amount of damages have the defendants, *Riese and Plichta*, suffered as a result of [the SALT Group's or the Stroud Group's] unfair and deceptive trade practices." (emphasis added). The jury answered "$300,000."

The SALT and Stroud Groups, on the other hand, maintain that, because they committed two violations of the UTPA, one that injured the Riese Group and one that injured Gibraltar, the Riese Group and Gibraltar should each receive $450,000 of the UTPA award. Under such an allocation, the Riese Group and Gibraltar also would collectively receive $900,000, consistent with the Judgment.

In fact, the Riese Group and Gibraltar could, consistent with the Judgment, collectively receive the $900,000 UTPA award under a multitude of scenarios other than those advocated by the parties. So long as the sum collected by the Riese Group and Gibraltar totalled $900,000, the aspect of the Judgment directing that Riese, Plichta, and Gibraltar collectively receive the $900,000 UTPA award would be satisfied. Under the Post-Mandate Judgment, on the other hand, only a single allocation scenario is permissible. We agree with the SALT and Stroud Groups that the allocation scenario specified in the Post-Mandate Judgment was a possible allocation scenario under the Judgment. We disagree, however, with their contention that, because the allocation scenario of the Post-Mandate Judgment was possible under the Judgment, the Post-Mandate Judgment did not alter the Judgment. The Judgment did not preclude Riese and Plichta, without Gibraltar, from collecting the $900,000 UTPA award. The Post-Mandate Judgment, however, prohibits them from so doing. In specifying how the $900,000 UTPA award should be allocated between the Riese Group and Gibraltar, the Post-Mandate Judgment foreclosed all possible allocation scenarios save one. It thereby altered the Judgment.

## B.

The SALT and Stroud Groups contend that, even if entry of the Post-Mandate Judgment altered the Judgment, its entry did not contravene the mandate rule because the Post-Mandate Judgment is consistent with, rather than contrary to, our SALT I mandate. We disagree. As we held in *Bell*, the mandate rule not only precludes a lower court from doing what the mandate expressly forbids, the rule also "forecloses litigation of issues decided by the district court but foregone on appeal or otherwise waived . . . ." 5 F.3d at 66. Even if the allocation and setoff scenario specified in the Post-Mandate Judgment did not conflict with any specific aspect of SALT I,[11] it contravened the man-

---

[11]The allocation and setoff scenario provided for in the Post-Mandate Judgment appears to conflict with the statement in SALT I that "the dis-

date if its entry required the litigation of an issue the SALT and Stroud Groups failed to raise and pursue in the SALT I appeal. Here, the Post-Mandate Judgment contravened the SALT I mandate because entry of that judgment required the litigation of such an issue.

In the Rejection Order, the district court observed that the only net recovery possible under the Judgment would be that provided for under the UTPA Net Recovery Approach. The SALT and Stroud Groups rely on this provision of the Rejection Order to support their position that the court did not contravene the mandate rule in the Post-Mandate Judgment because, in entering that judgment, it merely incorporated the UTPA Net Recovery Approach into the Judgment — an action the court had determined, prior to our SALT I mandate, to be proper. This contention, however, cuts against the position of the SALT and Stroud Groups. The district court's authority to enter a new judgment on July 2, 1999, implementing the UTPA Net Recovery Approach, has no bearing on whether the court continued to possess such authority *following the issuance of our mandate*. The Rejection Order is significant, however, in that, after it was entered, the SALT and Stroud Groups were on notice that the UTPA Net Recovery Approach was the only form of net recovery permissible under the Judgment.

The Rejection Order did not require incorporation of the UTPA Net Recovery Approach into the Judgment and, after entering the Rejection Order, the court did not amend the Judgment to reflect such an incorporation. When the SALT and Stroud Groups appealed the Rejection Order, therefore, it was clear that, although the UTPA Net Recovery Approach could have been incorporated into the Judgment, the Judgment could also be properly executed without utilizing that approach. During SALT I, however, the SALT and Stroud Groups failed to contend that the Judgment should incorporate any net recovery approach — no issues of allocation or setoff under the Judgment were raised in SALT I.

The SALT and Stroud Groups maintain that, because issues regarding the proper allocation or setoff of the UTPA awards under the

---

trict court's award of treble damages *to the Riese Group*, in the aggregate sum of $900,000 . . . must be upheld." SALT I at 540 (emphasis added).

Judgment were not reasonably foreseeable, they were not required to raise them in their SALT I appeal. More specifically, the SALT and Stroud Groups contend that they did not waive these issues because they could not have reasonably foreseen that, under the Judgment, Riese and Plichta alone would record the entire $900,000 judgment. They maintain that their inability to foresee that the Judgment would not be recorded on Gibraltar's behalf was reasonable in light of the court's observation in the Rejection Order that implementation of the UTPA Net Recovery Approach would be proper under the Judgment. The record is to the contrary, however. Not only were the allocation and setoff issues reasonably foreseeable, the SALT and Stroud Groups actually foresaw the possibility that Riese and Plichta alone, without Gibraltar, would record the $900,000 UTPA award.

On July 14, 1999, twelve days after the district court entered its Rejection Order, the SALT and Stroud Groups noticed their appeal of that order. In their docketing statement on appeal, they asserted that they would raise the issue of how the Judgment should be applied for purposes of execution. In so doing, they then recognized that the Judgment did not specify how the $900,000 UTPA award should be allocated among Riese, Plichta, and Gibraltar. Furthermore, in specifying the allocation issue in their docketing statement, they acknowledged that the issue was not resolved to their satisfaction by the Rejection Order. The SALT and Stroud Groups recognized that Riese and Plichta were not precluded from recording the $900,000 judgment without Gibraltar, and yet they failed to pursue the allocation issue on appeal. And after we issued our mandate in SALT I, they returned to the district court to relitigate this very issue.

In addition to the docketing statement's declaration that the allocation issue had not yet been resolved, the record indicates that the SALT and Stroud Groups understood the *practical implications* of the Judgment — that Riese and Plichta stood to net approximately $450,000 (i.e., that Riese and Plichta's total liabilities were $450,001, excluding costs and interest, and that they would collect the entire $900,000 UTPA award, leaving them with a net recovery of approximately $450,000). In their brief in SALT I, for example, the SALT and Stroud Groups asserted that "[t]he judgment awarded *Riese and Plichta* $900,000 against Stroud for unfair and deceptive trade practices" (emphasis added), and noted that "[t]he jury found *Riese and*

*Plichta* suffered damages in the amount of $300,000 as a result of the plaintiffs' acts and practices (which the District Court trebled to $900,000)." Appellants' Brief at 4, 18 (emphasis added).

Finally, the SALT and Stroud Groups acknowledged at oral argument and in their Petition that they understood how the Judgment might be executed. During oral argument, their counsel observed that the result of the Judgment "may well be that, instead of money flowing into the partnership . . ., the result is going to be money flowing — $900,000 in fact — flowing back to Mr. Riese and Mr. Plichta . . . ." And in their Petition, they acknowledged that "the jury awarded . . . $300,000 to the Riese Group," and they observed that the result of the UTPA determination in SALT I "is that the Riese Group stands to recover from the Stroud Group $450,000, plus interest."

In sum, the record reflects that the SALT and Stroud Groups knew that Riese and Plichta were not precluded from recording and executing the $900,000 judgment. More importantly, the record reflects their recognition that, *under our mandate*, Riese and Plichta were permitted to record and execute the $900,000 judgment. They understood, therefore, that in seeking the Post-Mandate Judgment, they sought to preclude Riese and Plichta from recording and executing the Judgment in a manner authorized by SALT I. Recognizing what might come to pass under the Judgment, however, the SALT and Stroud Groups failed to pursue the allocation and setoff issue on appeal. They were foreclosed by the mandate rule, therefore, from resurrecting this issue in the district court.[12]

### IV.

Pursuant to the foregoing, we vacate the Post-Mandate Judgment and remand for reentry of the Judgment.

*VACATED AND REMANDED*

---

[12]The Riese Group and Gibraltar also maintain that the district court lacked the authority, pursuant to Rule 54(c), to enter an amended judgment three years after it entered the Judgment and after that Judgment had been affirmed by this Court. Because the Post-Mandate Judgment violated the mandate rule, we need not address the issue of whether, absent the mandate rule, the district court could, pursuant to Rule 54(c), enter the Post-Mandate Judgment.