*556 DIANA GRIBBON MOTZ, Circuit Judge:
This Employee Retirement Income Security Act (“ERISA”) case returns to us for a third time. The beneficiaries of an ERISA retirement plan appeal the judgment, issued after a full bench trial, that the fiduciary’s breach of its duty of procedural prudence did not cause the substantial losses in the retirement plan resulting from the sale of non-employer stock funds. We had previously remanded the case to the district court so that it could apply the correct legal standard for determining loss causation, but we expressed no opinion as to the proper outcome of the case. On remand, applying the correct standard, the court found that the fiduciary’s breach did not cause the losses because a prudent fiduciary would have made the same divestment decision at the same time and in the same manner. For the reasons that follow, we affirm.
I.
A.
We begin with a brief review of the events leading up to this lawsuit. Our previous opinions and those of the district court set forth the facts of this case in far greater detail. See generally Tatum v. RJR Pension Inv. Comm. (Tatum TV), 761 F.3d 346, 351-55 (4th Cir. 2014); Tatum v. R.J. Reynolds Tobacco Co. (Tatum II), 392 F.3d 636, 637-39 (4th Cir. 2004); Tatum v. R.J. Reynolds Tobacco Co. (Tatum V), No. 1:02-cv-00373, 2016 WL 660902, at *2-*12 (M.D.N.C. Feb. 18, 2016); Tatum v. R.J. Reynolds Tobacco Co. (Tatum III), 926 F.Supp.2d 648, 651-69 (M.D.N.C. 2013).
In 1999, RJR Nabisco, Inc. decided to spin off the company’s food business, Nabisco, from its tobacco business. Tatum V, 2016 WL 660902, at *2. The company provided several rationales for this decision. But the critical motivating force seems to have been that tobacco litigation against RJR adversely affected the value of Nabisco stock. Id. at *3.
Prior to the spin-off, participants in RJR Nabisco’s ERISA-covered retirement plan (“the Plan”) could hold stock in their retirement accounts in two funds related to the company: the RJR Nabisco Common Stock Fund and the Nabisco Common Stock Fund. Id. at *1. “After the spin-off, the RJR Nabisco Common Stock Fund was divided into two separate funds: the Nabisco Group Holdings Common Stock Fund ..., which held the stock from the food business, and the RJR Common Stock Fund, which held the stock from the tobacco business.” Tatum TV, 761 F.3d at 379. “Thus, as a result of the spin-off, there were two funds holding exclusively Nabisco stock: the Nabisco Common Stock Fund, which existed prior to the spin-off, and the Nabisco Group Holdings Common Stock Fund, which was created as a result of the spin-off’ (collectively the “Nabisco Funds”). Id. at 379 n.1. RJR, as the Plan administrator, concluded that, given the spin-off, “it would be inappropriate to hold stock in what was to become a non-related company.” Tatum V, 2016 WL 660902, at *4. Accordingly, RJR informed Plan participants that the Nabisco Funds would be frozen on the date of the spin-off and divested within six months. Id. at *5.
The spin-off occurred on June 14, 1999. Id. At that time, RJR amended the Plan documents to freeze the Nabisco Funds. This meant that Plan participants could make no additional investments in the Funds, but participants could sell their shares in the Funds. Id. at *1, *5. In the months immediately following the spin-off, Nabisco stock sharply declined in value. Tatum IV, 761 F.3d at 353. In October 1999, RJR held a series of meetings to discuss the possibility of reversing its deci *557 sion to divest the Funds, but ultimately decided to continue as planned. Id. Also in October, RJR experienced a significant adverse verdict in the tobacco litigation, which caused both RJR and Nabisco stock to fall. Tatum V, 2016 WL 660902, at *7. In November, RJR attempted to amend the Plan documents to indicate that the Plan would no longer offer the Nabisco Funds.[1] Id. at *9-*10. During this time, Nabisco stock continued to decrease in value. Id. From the date of the spin-off until January 31, 2000, when the divestment occurred, the price of the Nabisco Group Holdings common stock fell 60%, and the price of the Nabisco common stock fell by almost 30%. Id. at *11.
Two months after the divestment, on March 30, 2000, investor Carl Icahn made an unsolicited bid to take over Nabisco, which allowed Nabisco to pursue corporate restructuring without tax consequences. Id. Nabisco Group Holdings rejected the Icahn offer in April, “but announced that it would explore all alternatives to maximize shareholder value, effectively putting [Nabisco Group Holdings] on the auction block.” Id. By December 2000, Philip Morris had acquired Nabisco for $55 per share and RJR had bought Nabisco Group Holdings for $30 a share. Id. By the time the sales were completed, the price of both companies’ stock had increased dramatically; Nabisco Group Holdings common stock increased 247% and Nabisco common stock increased 82%. Id.

B.

In May 2002, Richard Tatum, an RJR employee, brought this action against RJR and various RJR committees on behalf of himself and others similarly situated. He alleged that the defendants, as fiduciaries of the Plan, “breached their ... duties under ERISA by eliminating Nabisco stock from the Plan on an arbitrary time-line without conducting a thorough investigation.” Tatum IV, 761 F.3d at 355. Tatum further charged “that their fiduciary breach caused substantial loss to the Plan because it forced the sale of the Plan’s Nabisco Funds at their all-time low, despite the strong likelihood that Nabisco’s stock prices would rebound.” Id.
The district court initially concluded that the Plan documents required divestment of the Nabisco Funds and granted RJR’s motion to dismiss. On appeal, we held “that the Plan documents did not mandate divestment of the Nabisco Funds, and thus did not preclude Tatum from stating a claim against the defendants for breach of fiduciary duty.” Id. (citing Tatum II, 392 F.3d at 637). Accordingly, we reversed the judgment of the district court and remanded the case to it.
The district court then conducted a four-week bench trial, which involved the testimony of numerous fact and expert witnesses and a mountain of documents. Upon consideration of this evidence, the court issued a detañed opinion containing extensive factual findings. The court held that RJR (1) breached its fiduciary duty of procedural prudence when it decided to remove the Nabisco Funds from the Plan “without undertaking a proper investigation into the prudence of doing so,” (2) “bore the burden of proving that [this] breach did not cause the alleged losses to the Plan,” and (3) had, despite its breach, met its burden by showing that a hypothetical prudent fiduciary could have made *558 the same decision. Id. (quoting Tatum III, 926 F.Supp.2d at 651).
On appeal, we agreed with the district court that RJR had breached its duty of prudence as an ERISA fiduciary, and, as such, bore the burden of proving the losses were not attributable to the breach. Id. at 351. However, we vacated the district court’s judgment because we concluded that our precedent requires a breaching fiduciary to prove by a preponderance of the evidence that a hypothetical prudent fiduciary would have made the same decision. Id. at 351, 365, 368 (citing Plasterers’ Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 218 (4th Cir. 2011)). We instructed the court “to review the evidence to determine whether RJR has met its.burden of proving by a preponderance of the evidence that a prudent fiduciary would have made the same decision.” Id. at 368. That review, we noted, might or might not lead the court to the same ultimate conclusion. This determination was for the district court on remand; we expressed no view as to the proper resolution of the case.
On remand, the court issued another thorough opinion. In it, the court explained why in its view RJR had met its burden of showing by a preponderance of the evidence that a hypothetical prudent fiduciary would have divested the Nabisco Funds in the manner and at the time RJR did. Tatum V, 2016 WL 660902, at *26. Tatum filed the instant appeal.
II.
Tatum initially maintains that the district court disregarded our mandate, a question we consider de novo. See S. Atl. Ltd. P’ship of Tenn., LP v. Riese, 356 F.3d 576, 583 (4th Cir. 2004). Tatum argues that, in holding that a prudent fiduciary would have made the same decision as RJR made here, the court focused too much on risk, ignored the plain language of the Plan documents, failed to consider the testimony of Professor Thomas Lys, and did not explain why a prudent fiduciary would have divested the Nabisco Funds at the time that RJR did. We disagree.
As to the district court’s asserted singular focus on risk, we explained in Tatum TV that “while the presence of risk is a relevant consideration in determining whether to divest a fund held by an ERISA plan, it is not controlling.” 761 F.3d at 367. We see no indication that the district court impermissibly rested its analysis solely on risk. Even a cursory review of its opinion reveals that the court also considered value and expected returns, the diversity of the Plan’s investments, the requirements of the Plan documents, and the timing of the divestment. The court additionally took account of the nature of the Plan as a long-term savings vehicle and the role of a fiduciary in managing beneficiaries’ assets. Tatum V, 2016 WL 660902, at *13, *25. Had the court considered only risk, it would have erred. But it did not. Rather, the court acted entirely within our mandate in addressing risk as a “relevant consideration” along with other factors.
Next, Tatum takes issue with how the district court treated the Plan documents. Tatum contends that the court failed to give adequate consideration to the fact that these documents, absent the invalid November amendment, required that the Nabisco Funds remain frozen. In Tatum TV, we explained that, while the terms of the Plan documents cannot “trump the duty of prudence,” the “plan terms, and the fiduciary’s lack of compliance with those terms, inform a court’s inquiry as to how a prudent fiduciary would act under the circumstances.” 761 F.3d at 367 n.16. We directed the district court on remand *559 “to factor into its causation analysis RJR’s lack of compliance with the governing Plan document.” Id. at 368.
The district court did precisely that. The court found that “it is more likely true than not that had a prudent fiduciary reviewed the information available to it at the time, including Plan documents, public disclosures, analysts’ reports and associated research as to their significance, and newspaper articles, it would have decided to divest the Nabisco Funds at the time and in the manner as did RJR.” Tatum V, 2016 WL 660902, at *23 (emphasis added). Moreover, the court recognized that RJR had not amended the Plan documents but noted that no evidence suggested that RJR intentionally disregarded Plan language or that Plan participants were unaware of the planned divestment. See id. at *24. The court then concluded that, given these facts, failure to effectuate the Plan amendment did not “affect determination of the substantive issues addressed by a prudent fiduciary.” Id. at *25.[2]
Tatum’s assertion that the court refused to consider the testimony of Professor Lys similarly lacks merit. We instructed the court to consider Professor Lys’s testimony “as to what constituted a prudent investment decision.” Tatum IV, 761 F.3d at 368 n.17. The court did so— dedicating an entire paragraph to Professor Lys’s testimony as to how a prudent fiduciary would research an investment decision and citing Professor Lys’s testimony on additional issues over a dozen times. See, e.g., Tatum V, 2016 WL 660902, at *12-*13, *18, *20-*21, *23. The district court ultimately found Professor Lys’s testimony less persuasive than that of RJR’s experts, id. at *13, but the court certainly considered Professor Lys’s testimony.
Finally, Tatum claims that the district court violated our mandate by failing to weigh “the timing of the divestment as part of the totality-of-the-circumstances inquiry.”[3] But the district court’s straightforward opinion belies any argument that it refused to consider the timing of the divestment. Relying on expert testimony, *560 the court determined that a prudent fiduciary would have made the decision to divest the non-employer funds (the Nabisco Funds) and would have completed the divestment when RJR did. Id. at *23.[4]
In sum, the district court did not disregard our mandate. That conclusion, of course, does not resolve this appeal, or even whether the court correctly evaluated risk, Plan language, Professor Lys’s testimony, and the timing of the divestment. Tatum also argues that the court erred in its evaluation of these factors, and we now turn to those arguments.
III.
Tatum principally contends that in evaluating the evidence the district court applied two incorrect legal standards. The bulk of this argument rests on the assert-edly critical distinction between investment decisions and divestment decisions. Tatum maintains that because the court failed to recognize this distinction, it ignored “factors relevant to a divestment decision.” Tatum also claims that the district court, despite its explicit statements to the contrary, applied the improper “could have” standard that we rejected in Tatum TV. We review a district court’s factual findings for clear error and its legal conclusions and application of the law to the facts de novo. Tatum TV, 761 F.3d at 357.
A.
We can dispose of the “could have versus would have” challenge quickly. Tatum maintains that the district court must have improperly used the “could have” standard because that is the only standard that permitted the court to hold for RJR.[5]
*561 That argument is wishful thinking. In remanding the case, we explicitly recognized the possibility that, using the correct “would have” standard, the district court might find that RJR had met its burden. Tatum TV, 761 F.3d at 368. We explained that “[p]erhaps, after weighing all of the evidence, the district court will conclude that a prudent fiduciary would have sold employees’ existing investments at the time and in the manner RJR did because of the Funds’ high-risk nature, recent decline in value, and RJR’s interest in diversification.” Id. If the trial evidence had permitted the court to find only that a prudent fiduciary would not have divested the Nabisco Funds, we would not have remanded the case at all. See, e.g., Breeden v. Weinberger, 493 F.2d 1002, 1012 (4th Cir. 1974) (explaining that remand is unnecessary “where the record does not contain substantial evidence to support [the] decision ... under the correct legal standard”).
B.
Tatum’s remaining contention as to the district court’s asserted adoption of an incorrect legal standard proceeds in two parts. First, Tatum contends that the district court improperly failed to require a more demanding justification for a fiduciary’s divestment decisions than for its investment decisions. Second, he argues that the court’s failure to recognize this allegedly critical distinction led the court to assess the trial evidence incorrectly.
Tatum maintains that a fiduciary needs a compelling reason to divest, while the decision to invest requires less critical motivation. In support of this argument, Tatum offers only ERISA’s directive that a court examine a fiduciary’s decision in light of “an enterprise of a like character and with like aims,” 29 U.S.C. § 1104(a)(1)(B) (2012).
The statute itself does not define this phrase. The Supreme Court, however, has explained that an ERISA “enterprise of a like character and with like aims” is broadly defined as “an enterprise with ... the ‘exclusive purpose’ ... [of] ‘providing benefits to participants and their beneficiaries’ while ‘defraying reasonable expenses of administering the plan.’ ” Fifth Third Bancorp v. Dudenhoeffer, — U.S. -, 134 S.Ct. 2459, 2468, 189 L.Ed.2d 457 (2014) (quoting 29 U.S.C. § 1104(a)(1)(A)(i), (ii)). Given the Supreme Court’s expansive definition, we can hardly hold that a trial court commits legal error when it considers evidence related to prudent investment decisions to determine the propriety of a hypothetical prudent fiduciary’s divestment decisions.[6] Tatum does not cite a single court that has so held, and we refuse to do so in this case.
Because the district court did not err in refusing to require a more compel *562 ling reason for divestment decisions than for investment decisions, what remains of Tatum’s argument on this issue is a factual dispute over whether a prudent fiduciary would have refrained from divesting when RJR did and instead waited to see if the Nabisco Funds rebounded. The evidence presented at trial simply does not compel the conclusion that a prudent fiduciary would have done so.
At base, the district court had to determine whether RJR had shown by a preponderance of the evidence that a prudent fiduciary would have acted as RJR did. Tatum TV, 761 F.3d at 368. Contrary to what Tatum seems to imply, this does not mean that all the evidence must support RJR’s decision for RJR to prevail. See Preponderance of the Evidence, Black’s Law Dictionary (10th ed. 2014) (defining “preponderance of the evidence” as “evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other ... however slight the edge may be”). Nor does it mean that the district court must recite all the evidence it considered in reaching its holding. In a case like this one, in which the trial transcript exceeds 3,000 pages and the trial exhibits fill multiple binders, such a requirement would render the district court’s already heavy burden almost impossible.
Relying heavily on his experts’ testimony, Tatum particularly focuses on the timing of the divestment, arguing that a prudent fiduciary would not have divested the Nabisco Funds at the time that RJR did. Review of the record persuades us that the district court carefully considered the experts’ conflicting views as to the timing of the divestment and then explained why it found RJR’s experts more persuasive than Tatum’s.
As the court observed, RJR’s experts testified that a prudent fiduciary would have concluded that retaining the Nabisco Funds exposed beneficiaries to a high risk of future loss and reduced the diversity of the Plan. Tatum V, 2016 WL 660902, at *13-* 14. This is so because of the general risk inherent in single-stock funds, especially those of a non-employer, and the idiosyncratic risk of the Nabisco Funds owing to the fact that the Nabisco stock’s price fluctuations were highly correlated with the tobacco litigation. Id. Indeed, in the months after the spin-off, the Nabisco stock precipitously declined in price after a court awarded tobacco litigation plaintiffs a substantial verdict against RJR. Id. at *7, *13. This decline occurred in spite of the indemnification agreements between RJR and the Nabisco companies, and along with this continued litigation risk came “a non-negligible risk of bankruptcy” for Nabisco. Id. at *6-*7, *14. Given these facts, RJR’s experts did not believe a prudent fiduciary would have concluded that the Nabisco stock presented the opportunity to achieve the extraordinary returns that might offset the stock’s high risk of loss. Id. at *21-*22.
As the district court recognized, Tatum’s experts reached a very different conclusion. In particular, Tatum relied on the testimony of Dr. Alan Biller, who opined that a prudent fiduciary would not have divested the Nabisco Funds. In Dr. Biller’s view, divestment of a single, non-employer stock fund was justified only by “massive fraud in the company” or “[ejvidence or reason to think that the company was likely to go bankrupt,” neither of which he believed existed in this case.
The court explained that it found Dr. Biller’s testimony unpersuasive because Dr. Biller “did not follow his own guidance *563 when he reached his opinions.” Id. at *15. Dr. Biller had initially testified that a prudent fiduciary would consider not only analyst reports, but also “company filings with the SEC, news reports, and general commentary on the state of the company and the industry when determining whether or not to eliminate an investment option from a plan.” Id. But, as the district court noted, on cross-examination Dr. Biller conceded that before forming his opinion he did not read Nabisco’s financial statements or SEC filings detailing litigation liabilities, and he did not independently research news reports on the company or on the largest, of the tobacco litigation cases. Id. Instead, Dr. Biller based his opinion solely on the analysts’ reports and limited news stories that Tatum provided to him. Id. at *15-* 16.
Aside from contradicting his own advice, Dr. Biller’s heavy reliance on analysts’ reports was, in the district court’s view, especially problematic because the record evidence did “not suggest analyst recommendations provided meaningful investment direction.” Id. at *20. Rather, the trend among analysts at the time was to recommend buying and “the number of buy recommendations [for Nabisco stock] was not statistically different than the proportion of buy recommendations for the typical stock.” Id. at *21. Our review of the record substantiates the district court’s assessment of the analysts’ reports. For example, Professor Richard McEnally, an expert for RJR, testified that “analyst ratings and change in analyst ratings for [Nabisco stock] did not provide any meaningful basis for investment decisions from June 1999 to January 31, 2000.” Id. at *20. Similarly, Dr. John Montgomery, another expert for RJR, testified that favorable analysts’ reports were not associated with more favorable returns than less favorable reports, especially for larger companies like Nabisco. Id. Given this evidence and the fact that Dr. Biller’s testimony was based on a narrow universe of questionable information, the court committed no clear error in rejecting Dr. Biller’s conclusions.
In sum, the district court weighed all the evidence presented and came to a reasonable conclusion. The court had discussed some of this evidence in its previous opinion, but at that time it had analyzed the evidence against the less stringent “could have” standard, which made it impossible to discern whether RJR had met its burden under the “would have” standard. See Tatum TV, 761 F.3d at 368 (“[W]e must conclude that application of the incorrect legal standard may have influenced the court’s decision.”). Applying the more rigorous “would have” standard, the district court necessarily assessed all the evidence more critically.[7] It did not err in doing so.
IV.
As his final attempt to persuade us to the contrary, Tatum contends that proper application of the efficient market hypothesis and the Supreme Court’s holding in Fifth Third required the court to conclude that a prudent fiduciary would not have divested at the time and in the manner RJR did. But Tatum misunderstands the efficient market hypothesis and misreads *564 Fifth Third. Neither compel a finding against RJR.
A.
An efficient market processes all public information about a stock and adjusts the stock’s price accordingly. See Tatum V, 2016 WL 660902, at *16. Because this process occurs quickly, the efficient market hypothesis predicts that typical investors cannot exploit public information prior to the market adjusting the price. Id. (citing both parties’ experts’ explanation of the efficient market hypothesis). For this reason, investors in stocks trading in an efficient market generally cannot expect above-market, let alone extraordinary, returns. Id. As the Supreme Court explained in Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, — U.S. -, 133 S.Ct. 1184, 1192, 185 L.Ed.2d 308 (2013), “Few investors in [efficient] markets, if any, can consistently achieve above-market returns by trading based on publicly available information alone, for if such above-market returns were readily attainable, it would mean that market prices were not efficiently incorporating the full supply of public information.”
Based on expert testimony, the district court found that Nabisco stock was publicly traded in an efficient market. The district court confirmed, consistent with its finding that the market was efficient, that extraordinary returns from the stock were highly unlikely. Although Tatum contends that in doing so the court faltered, he offers no argument on appeal that the market for Nabisco stock was inefficient. Moreover, he concedes that extraordinary returns are not possible in an efficient market.
B.
Nonetheless, Tatum claims that the district court’s -efficient market analysis is at odds the Supreme Court’s reasoning in Fifth Third. There, the Court applied the efficient market hypothesis to a claim alleging that a fiduciary should have known the market was overvaluing a stock. In deeming such claims “implausible,” the Supreme Court explained that, absent “special circumstances,”[8] when evaluating publicly traded stocks, a fiduciary may prudently rely on the market price as “the best estimate of the value of the stocks ... that is available to him.” See 134 S.Ct. at 2471 (quotations marks and citation omitted). This is so because an efficient market adjusts the price of a stock in response to all public information about the stock.
Applying this principle, the district court found that a hypothetical prudent fiduciary would have properly relied on the market price of the Nabisco stock as a correct estimate of the stock’s present value. See Tatum V, 2016 WL 660902, at *17-*18, *25-*26. The district court’s conclusion is entirely consistent with Fifth Third and its explication of the efficient market theory hypothesis.
Tatum misreads Fifth Third to hold that a hypothetical prudent fiduciary is not justified in divesting a stock based on public information about risk. But the Court in Fifth Third held no such thing. It merely *565 held that a fiduciary is not required to divest a high-priced stock based on public information that shows a risk of price decrease. Fifth Third, 134 S.Ct. at 2471-72. This is because, in an efficient market, a fiduciary can rely on the market price to reflect the public information about risk of loss, even if, in the beneficiaries view, the market valuation is not properly accounting for the true risk of loss.[9] Id. Applied to the facts of this case, Fifth Third teaches that a prudent fiduciary would have relied on the low market price of the Nabisco stock as the current value of the stock. This conclusion provides no help to Tatum, and in fact offers support for RJR’s contention that a prudent fiduciary would have chosen to divest the Nabisco Funds.
C.
Tatum misreads Fifth Third in yet another way. He claims it supports his assertion that because the low market price of the Nabisco stock reflected the risk of loss posed by the tobacco litigation, the district court erred by giving risk too much consideration as compared to Nabisco’s positive attributes as a company. Tatum argues that the court’s analysis was “internally inconsistent” with its application of the efficient market hypothesis. He asserts that “[bjecause all of this information [about the tobacco litigation] was publicly disclosed before the forced divestment ..., the efficient market hypothesis requires the conclusion that these publicly disclosed future risks were already factored into the price of the Nabisco Funds.” According to Tatum, “By concluding, as it did here, that positive public information did not justify expectations of future returns while negative public information justified concerns about future loss, the court committed clear error.” This argument rests on flawed economic theory and a refusal to appreciate a fiduciary’s role.
Fifth Third instructs that, in an efficient market, all public information, negative and positive, is reflected in a stock’s market price. See 134 S.Ct. at 2472. Tatum concedes as much, but he inexplicably argues that, in considering what a prudent fiduciary would have done, the district court should have considered the positive attributes of Nabisco but not the litigation risk. This is assertedly so because the litigation risk had already been reflected in the market price of the Nabisco stock. But of course, Nabisco’s positive attributes had also already been reflected in the price of the Nabisco stock. At trial, the evidence confirmed this very point and that the low price of the stock indicated that the negative information dominated the market’s valuation in spite of the positive information. See Tatum V, 2016 WL 660902, at *2i-*22. No case suggests that a fiduciary or a court assessing fiduciary duties should give the positive information extra consideration when the market did not do so. Such an artificial advantage for some public information at the expense of other public information flies in the face of the efficient market hypothesis.[10]
*566 Although Tatum cites to Fifth Third as support for this argument, that case concerned allegations that the market overvalued a stock and that a fiduciary should have known the stock was overvalued because of public information. 134 S. Ct. at 2472. The Supreme Court did not address the loss causation analysis, which requires consideration of more than the value of a stock in determining what a prudent fiduciary would have done, and the Court certainly did not hold that a prudent fiduciary would not consider risk.
In fact, ERISA directs that prudent fiduciaries act “with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.” 29 U.S.C. § 1104(a)(1) (B). And there was general agreement among experts at trial that a prudent fiduciary has a duty to consider both risk and expected returns as they affect the overall Plan and its goals. Tatum V, 2016 WL 660902, at *13.
Neither the evidence at trial nor any case supports the view that the way an efficient market processes information in setting the stock’s price captures fully and accurately the goals of an ERISA plan or a fiduciary’s duty. See id. § 1104(a)(1) (C); Restatement (Third) of Trusts § 90 cmt. f(1) (Am. Law Inst. 2007) (“[F]iduciaries ... ordinarily have a duty to seek ... the lowest level of risk and cost for a particular level of expected return — or, inversely, the highest return for a given level of risk and cost.”). Simply following the market’s pricing of a stock at a given time cannot satisfy a fiduciary’s duty “to conduct a regular review of its investment,” Tibbie v. Edison Int'l, — U.S. -, 135 S.Ct. 1823, 1827-28, 191 L.Ed.2d 795 (2015), which necessarily involves judgment beyond the price. See id. at 1828 (explaining that a fiduciary must monitor investments “to ensure that they are appropriate”). The market, in incorporating the tobacco litigation risk into the Nabisco stock’s price, could not consider how that risk affects the “character” or composition of the Plan, the Plan’s “aims,” or the fiduciary’s duty to administer the Plan in the interest of the beneficiaries and comply with the Plan Documents. See 29 U.S.C. § 1104(a)(1) (B). A prudent fiduciary would have considered all of these factors.
Tatum insists that the court erred in balancing the stock’s risk of loss against the possibility of extraordinary returns because such returns are not possible in an efficient market. This is precisely the point. The district court explained that a prudent fiduciary would have balanced the increased risk of loss that the Nabisco Funds brought to the Plan — risk reflected in the low stock price, but also the risk inherent in their lack of diversity within the Plan and the Nabisco stock’s high correlation with RJR’s battered stock— against the Funds’ likely average returns. See Tatum V, 2016 WL 660902, at *16. The court found that a prudent fiduciary would have concluded the Nabisco Funds’ expected returns did not justify the increased risk of loss to the Plan,[11] especially be *567 cause ERISA requires that a fiduciary diversify plan assets to minimize risk of loss. Id. at *25 (citing 29 U.S.C. § 1104(a)(1)(C)). This conclusion was well-supported by the record and accords with the efficient market hypothesis.
In short, the district court’s findings and analysis entirely accord with the efficient market hypothesis and Fifth Third.
V.
As appealing as they may be to the specific and unusual facts of this case, Tatum’s arguments create an impossible standard for fiduciaries. In Tatum’s view, a hypothetical prudent fiduciary would have concluded that the Nabisco stock was undervalued and that some unknown event would occur to increase its value unexpectedly or to cease its precipitous decline so that it would increase in value.
But Tatum offered no evidence that anyone anticipated the post-divestment Icahn offer or that Nabisco would have then pursued the corporate restructuring that ultimately increased the price of the Nabisco stock. Indeed, as the district court noted, only three days before the eventual post-divestment Icahn offer, Salomon Smith Barney reported, with no mention of a potential Icahn offer, that Nabisco stock might be strong long-term but was currently depressed, volatile, and “impacted by investor concerns” about litigation. See id. at *12. The record evidence provides sufficient support for the conclusion that a prudent fiduciary would have determined that the Nabisco. Funds increased the Plan’s overall risk of loss and that this risk was unlikely to be justified by high returns.
This is not to say that in retrospect divesting the Nabisco Funds when the Nabisco stock was at a record low was desirable. But the fact that the price of the Nabisco stock was at a record low is apparent only in hindsight, and the decreased price of the Nabisco stock is but one factor to be considered among the totality of the circumstances. Had there been evidence that the Nabisco stock showed some resistance to RJR’s tobacco litigation losses, or that Icahn’s offer was all but assured, or that a prudent fiduciary would not have amended the Plan Documents, the district court, analyzing these very different facts under the more demanding “would have” standard, might well have concluded that a prudent fiduciary would have waited to divest the Funds. But Tatum offered no such evidence.
One can easily hypothesize a different lawsuit challenging divestment timing involving the same spin-off and sale of the Nabisco stock. In that case, as in this one, the price of the Nabisco stock would steadily and precipitously decline in the months after the spin-off. In that case, as in this one, Nabisco would maintain its strong fundamentals and excellent long-term prospects. And in that case, as in this one, the majority of analysts would advise investors to hold or even buy the Nabisco stock. In view of these facts, in this hypothetical case, rather than divesting in January, RJR would choose to defer divestment of the Nabisco Funds. But in the hypothetical case, instead of an unexpected offer from Carl Icahn, in late March RJR would receive a string of massive verdicts in the numerous tobacco litigation cases, causing the price of the Nabisco stock to . plummet. By December, instead of trading at $30 to $50 a share, the Nabisco stock in *568 our hypothetical case would be trading at $0.30 to $0.50 a share. It is hard to argue that the fiduciaries in our hypothetical case made the better choice. Rather, as the hypothetical illustrates, much of Tatum’s timing evidence depends on facts not known (and not foreseeable) when the divestment occurred. Yet he argues that a prudent fiduciary would have anticipated these facts.
The “would have” standard does not demand such an impossible feat. Having a standard in which the fiduciary is held liable regardless of whether an outcome is foreseeable is akin to having no standard at all, eliminating the purpose of the loss causation analysis. Neither ERISA nor the efficient market theory requires that fiduciaries shoulder such burden or absorb such risk. As the Supreme Court explained in Fifth Third, a fiduciary cannot be required to predict the future. See 134 S.Ct. at 2472. For this very reason, our previous opinion left open the possibility that, when the district court applied the correct, more rigorous “would have” standard, the court would find that RJR had met its burden. Given the substantial record evidence supporting the district court’s holding, we cannot conclude that the district court erred.
VI.
Accordingly, the judgment of the district court is

AFFIRMED.

. The district court and the parties discovered during trial that RJR had not properly ratified the November amendment, rendering it void. Tatum V, 2016 WL 660902, at *24. Thus, at the time of the divestment, the Plan documents required that the Nabisco Funds remain frozen. Tatum IV; 761 F.3d at 367.

. In remanding, we did not specify how a prudent fiduciary would have addressed the Plan documents. The dissent is troubled by the district court’s reference to what the decidedly imprudent fiduciaries would have done had they recognized the November Amendment was invalid or what a prudent fiduciary would have done had it encountered an invalid amendment. While we might have drafted this analysis differently, we read the dissent to require that the district court answer a question our mandate did not pose, i.e., "whether a hypothetical fiduciary would have ignored the Plan’s language,” which implies that the Plan documents were controlling. The mandate only required the court to consider what a prudent fiduciary would have done given the language of the Plan. Tatum TV, 761 F.3d at 367-68. We did not, and could not, hold that the language of the Plan trumps the duty of prudence. Id. 761 F.3d at 367 n.l. Tatum himself recognizes in his reply brief that the Plan documents create no "presumption that the Nabisco Funds should have remained in the Plan” and argues only that the Plan language was "relevant to what a hypothetical prudent fiduciary would have done.”

. In support of this argument, Tatum relies on the portion of our opinion in Tatum TV in which we found that RJR had breached its fiduciary duty of procedural prudence in divesting the Nabisco Funds prior to "undertaking a proper investigation into the prudence of doing so.” Tatum TV, 761 F.3d at 355 (quoting Tatum III, 926 F.Supp.2d at 651); see also id. at 360-61. In the course of discussing RJR’s failure to engage in a prudent investigation into what would be best for the Plan beneficiaries, we characterized RJR’s divestment "timeframe" as "arbitrary.” Id. at 361. Our analysis focused on the arbitrariness of RJR’s investigative process, i.e., RJR's lack of procedural prudence. We did not hold, as Tatum seems to imply, that a prudent fiduciary would not have divested when RJR did. Rather, we expressly left that question to the district court on remand. See id. at 368.

. The dissent suggests the district court ignored our mandate as to the timing of the divestment by considering only how long it would take to effectuate the divestment. We cannot agree. The district court carefully considered whether a prudent fiduciary would have waited to see if the Nabisco Funds rebounded, ultimately concluding that a prudent fiduciary would have divested as planned. See Tatum V, 2016 WL 660902, at *14, *16, *20-*23. Only then did the court consider the evidence regarding how long it would have taken a prudent fiduciary to effectuate the divestment. See id. at *23, *26. We recount the evidence supporting the district court's analysis in detail within. See infra Part III.B. Furthermore, we struggle to see how any fiduciary could meet the "would have" standard as the dissent envisions it applying to the timing in this case, given the record evidence. Both parties’ experts agreed six months to a year was necessary to effectuate the divestment, and no party offered evidence that a prudent fiduciary would have waited longer than necessary after making the decision to divest, which would have risked further losses. Id. at *23,

. For good measure, RJR and amicus repeat their argument that this court should adopt the "could have” standard. Tatum TV held that the proper standard was what a prudent fiduciary "would have" done. 761 F.3d at 357. This holding constitutes the law of the case and Fourth Circuit precedent. See id. at 365-66. To overcome the law of the case, RJR must show that our previous decision was clearly erroneous or “would undoubtedly work a ‘manifest injustice.' ” Agostini v. Felton, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting Arizona v. California, 460 U.S. 605, 618 n.8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). Similarly, to persuade us to ignore a prior panel’s holding, RJR must provide an "in banc overruling or a superseding contrary decision of the Supreme Court.” Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir. 1990). RJR fails to meet this burden. None of the cases RJR cites, including Amgen Inc. v. Harris, - U.S. -, 136 S.Ct. 758, 193 L.Ed.2d 696 (2016) (per curiam), consider the issue in this case: loss causation analysis and non-employer single-stock funds. Rather, they concern the appropriate way to plead claims for breach of fiduciary duty, particularly those based on nonpublic information, or involving employee stock ownership plans. See, e.g., Coburn v. Evercore Tr. Co., N.A., 844 F.3d 965 (D.C. Cir. *561 2016); Whitley v. BP, P.L.C., 838 F.3d 523 (5th Cir. 2016); Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56 (2d Cir. 2016) (per curiam); Pfeil v. State St. Bank & Tr. Co., 806 F.3d 377 (6th Cir. 2015). As the Department of Labor explained in its excellent brief and oral argument, Fifth Third Bancorp v. Dudenhoeffer, - U.S. -, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014), and Amgen announced a pleading standard for breach of fiduciary duty involving insider information and employer stocks. Neither case is controlling on the issue of loss causation.

. At Tatum’s urging, we instructed the district court on remand to consider the testimony of Professor Lys. We explained that this "testimony was relevant as to what constituted a prudent investment decision." Tatum IV, 761 F.3d at 368 n.17 (emphasis added). Tatum does not contend that our instruction was erroneous. Rather, in his brief, Tatum himself quotes and relies on these very words.

. Compare, e.g., Tatum III, 926 F.Supp.2d at 685 (discussing RJR's bankruptcy risk but not Nabisco’s bankruptcy risk), with Tatum V, 2016 WL 660902, at *14 (quantifying Nabisco's bankruptcy risk); Tatum III, 926 F.Supp.2d at 688-89 (concluding that the evidence supported finding that a prudent fiduciary "would not • have been obligated to maintain the Nabisco Funds” and so could have divested), with Tatum V, 2016 WL 660902, at *25-*26 (reviewing the evidence that supported finding that a prudent fiduciary would have divested).

. The Court did not define "special circumstances” but indicated that a special circumstance could be something "affecting the reliability of the market price as 'an unbiased assessment of the security’s value in light of all public information/ that would make reliance on the market's valuation imprudent.” Fifth Third, 134 S.Ct. at 2472 (quoting Halliburton Co. v. Erica P. John Fund, Inc., - U.S. -, 134 S.Ct. 2398, 2411, 189 L.Ed.2d 339 (2014)). The Supreme Court in Fifth Third did not find any special circumstances, and Tatum does not suggest any are present in this case.

. Fifth Third discussed at length how nonpublic information factors into the breach of fiduciary prudence analysis and whether administrators of employee stock ownership plans are entitled to a “presumption of prudence.” 134 S.Ct. at 2467, 2472. The case at hand does not involve these issues.

. Attempting to avoid this conclusion, Tatum implies that public information as to Nabisco's tobacco litigation liabilities differs in kind from public information as to the company's positive attributes. In Tatum's view, only the information about the tobacco litigation involved “risk,” and that “risk” was already reflected in the stock’s market price. But, in fact, both the information as to the tobacco litigation and the information as to Nabisco’s positive attributes provide enlightenment as to the risk of future price changes. Of course, the poor tobacco litigation outcomes tended *566 to show a likelihood that the Nabisco stock would have a bad year, i.e., a risk that the stock's market price and expected returns would decrease. But the positive information about Nabisco also provided risk information. For it tended to show a likelihood that the company would have a good year, i.e., that a risk that the stock's market price and expected returns would increase.

. It follows that any suggestion that a prudent fiduciary would have expected the price of the Nabisco stock to increase dramatically and offset the tobacco litigation risk is simply incompatible with the district court’s unchal *567 lenged and well-supported conclusion that the market for Nabisco stock was efficient, see Tatum V, 2016 WL 660902, at ⅜16-⅜19.