**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1212**

CHRISTINA STEGEMANN,

        Appellant,

and

JEFFREY QUATRONE, on Behalf of Gannett Co., Inc. 401(k) Savings Plan and all others similarly situated,

        Plaintiff - Appellant,

v.

GANNETT COMPANY, INC.; THE GANNETT BENEFIT PLANS COMMITTEE,

        Defendants - Appellees,

and

JOHN AND JANE DOES 1-10,

        Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:18-cv-00325-AJT-JFA)

Argued: May 26, 2020                       Decided: August 11, 2020

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

Vacated and remanded by published opinion. Judge Wynn wrote the majority opinion, in which Judge Floyd joined. Judge Niemeyer wrote a dissenting opinion.

---

**ARGUED:** Gregory Y. Porter, BAILEY & GLASSER LLP, Washington, D.C., for Appellants. Eric S. Mattson, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellees. **ON BRIEF:** Robert A. Izard, Mark P. Kindall, Douglas P. Needham, IZARD KINDALL & RAABE LLP, West Hartford, Connecticut; Mark G. Boyko, BAILEY & GLASSER LLP, Washington, D.C., for Appellants. Laurin H. Mills, SAMEK | WERTHER | MILLS, Alexandria, Virginia, for Appellees.

---

WYNN, Circuit Judge:

Plaintiffs-Appellants Christina Stegemann and Jeffrey Quatrone, participants in the Gannett Co., Inc. 401(k) Savings Plan (the "Plan"), brought this suit on behalf of themselves and other participants in the Plan against the Plan's sponsor, Defendant Gannett Company, Inc., and the Plan's management committee, Defendant Gannett Benefit Plans Committee (the "Committee"). Plaintiffs allege that Defendants breached their fiduciary duties of prudence and diversification under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq. See* 29 U.S.C. § 1104(a)(1). Specifically, Plaintiffs contend that Defendants ignored an imprudent single-stock fund in the Plan for several years, resulting in millions of dollars in losses.

The district court dismissed Plaintiffs' complaint for failure to state a claim. The court concluded that Defendants could not have known that the single-stock fund was imprudent, nor were they obligated to diversify it absent any notice it was imprudent.

But to state a claim, a plaintiff need only "plausibly allege that a fiduciary breached [a duty], causing a loss to the employee benefit plan." *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 195 (5th Cir. 2020). Put simply, Plaintiffs did just that—they set out facts describing how Defendants failed to monitor a fund, which led to a failure to recognize and remedy a defect, which then led to a loss to the Plan. Accordingly, we vacate the judgment of the district court and remand for further proceedings.

3

I.

A.

"ERISA, a 'comprehensive and reticulated statute,' governs employee benefit plans, including retirement plans." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)). "It is intended to 'promote the interests of employees and their beneficiaries in employee benefit plans.'" *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)).

Relevant to this appeal, ERISA draws on the common law of trusts and assigns plan fiduciaries "a number of detailed duties and responsibilities, which include the proper management, administration, and investment of plan assets." *Mertens*, 508 U.S. at 251 (internal quotation marks and alterations omitted). Courts have often called these fiduciary duties the "highest known to the law." *Schweitzer*, 960 F.3d at 194 (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)); *see also, e.g.*, *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (same).

In broad terms, Plaintiffs here allege that Defendants are such fiduciaries[1] and that they breached their duties of prudence and diversification, both of which we describe in more detail later in this opinion. *See* 29 U.S.C. § 1104(a)(1).

---

[1] An ERISA fiduciary is only "a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . [or] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Plaintiffs allege that both the Gannett Benefit Plans Committee and the Gannett Company, Inc. are such fiduciaries for the purposes of this lawsuit. Although Defendants do not contest that the Committee is a plan fiduciary, Defendants argue that Plaintiffs have not properly alleged Gannett

B.

In June 2015, the publicly traded media company Gannett Co., Inc.—a different Gannett Co., Inc. than is the Defendant in this case—changed its name to TEGNA, Inc. (hereinafter either "Old Gannett" or "TEGNA"). Simultaneously, it spun off its publishing business into a newly created, independently traded company, which inherited the name Gannett Co., Inc.[2] This new, spun-off Gannett Co., Inc. *is* the selfsame Defendant in this case (hereinafter "New Gannett").

Before the spin-off, Old Gannett sponsored a 401(k) retirement plan for its employees. Under ERISA, this plan was a "defined contribution plan" or an "individual account plan"—these terms are synonymous. *See* 29 U.SC. § 1002(34). Such a plan is structured so that each employee-participant "has an individual account and benefits are based on the amounts contributed to that participant's account." *Schweitzer*, 960 F.3d at 193. "Plan participants decide how much to contribute to their accounts and how to allocate their assets among an array of investment options selected by [plan fiduciaries]." *Id.* This array of investment options is often called a plan's "menu." In addition to contributions from an employee-participant, individual accounts can also be funded via contributions

---

Company, Inc.'s fiduciary status. Because the district court did not rule on this question in the first instance, we assume without deciding that both Defendants are fiduciaries and direct the district court to address this issue on remand. *See* J.A. 51 n.2.

[2] A "spin-off" is "[a] corporate divestiture in which a division of a corporation becomes an independent company and stock of the new company is distributed to the corporation's shareholders." *Spin-Off*, *Black's Law Dictionary* (11th ed. 2019).

from an employer, and exact arrangements vary. *See* Edward A. Zelinsky, *The Defined Contribution Paradigm*, 114 Yale L.J. 451, 455-57 (2004).[3]

During the Old Gannett period, although participants were generally able to direct which items on the menu they would invest in, Old Gannett's contributions to employees' accounts were in the form of employer stock. Oral Argument at 2:30-3:00. Thus, immediately prior to the spin-off, there were employees set to transfer over to the spun-off company who had individual accounts that included investments in Old Gannett stock.

When Old Gannett effectuated the spin-off and became TEGNA, Old Gannett's then-existing plan became the operative plan for the employees of the spun-off New Gannett, including those employees who transferred from Old Gannett to New Gannett. Employees staying with TEGNA, and their liabilities and account balances, transferred to a new TEGNA 401(k) plan.

It goes without saying that, post-spin-off, New Gannett employees were not employees of TEGNA. Furthermore, there was no reason going forward for New Gannett

---

[3] For further context, in addition to defined contribution plans, ERISA provides for defined benefit plans. In a defined benefit plan, a fiduciary makes all investment and allocation decisions for plan assets (whereas a participant in a defined contribution plan may control allocations within the limited universe of the plan menu selected by the fiduciaries). *See* *Schweitzer*, 960 F.3d at 193 & n.1. Although the defined contribution scheme allocates some power to participants, a fiduciary's menu construction is still important because poor menu construction "leads to predictably worse outcomes for investors." Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L. J. 1476, 1507 (2015). A defined contribution plan's distribution of decision-making power can impact a fiduciary's liability for investments. *See* 29 U.S.C. § 1104(c)(1). Accordingly, it is important to note what kind of plan is at issue in any given case. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255-56 (2008) (distinguishing defined contribution plans from defined benefit plans).

to make contributions to its employees' accounts in the form of TEGNA stock. Although historically connected, TEGNA and New Gannett were now two different publicly traded companies. However, because Old Gannett had made Old Gannett stock contributions for employees who now worked for New Gannett, the New Gannett Plan had a significant investment in Old Gannett's successor, TEGNA.

ERISA plans are governed in accordance with certain documents and instruments. *See* 29 U.S.C. § 1104(a)(1)(D). In this case, during the spin-off process, the governing document for the Old Gannett plan that New Gannett inherited was restated and amended to provide for the new TEGNA stock. *See* Dist. Ct. ECF 22-1, Exhibit A (hereinafter "New Gannett Plan Document").

The amendments created a "TEGNA Stock Fund" on the Plan's investment menu to hold, exclusively, TEGNA stock—such a fund is commonly called a "single-stock fund." *See* New Gannett Plan Document §§ 1.29, 6.7. However, the fund was "frozen," meaning that it started with the TEGNA stock in the Plan at the time of the spin-off, but participants would not be able to increase investment in the fund thereafter, and would only be able to shift investments out of the fund and into other options on the Plan's menu. *Id.* §§ 6.7, Appendix C(r). In fewer words, money could only travel one way: out of the fund. The New Gannett Plan Document explained this arrangement as being due to "the historical relationship between [New Gannett] and TEGNA." *Id.* § 6.7.

Roughly contemporaneous with the amendments that created and froze the TEGNA Stock Fund, New Gannett and TEGNA entered into an "Employee Matters Agreement."

7

J.A. 77.[4] While the New Gannett Plan Document set out that the TEGNA Stock Fund would be frozen, the Employee Matters Agreement allegedly stated that "all outstanding investments in [the TEGNA Stock Fund] shall be liquidated and reinvested in other investment funds offered [in the Plan] on such dates and in accordance with such procedures as are determined by the administrator of the [Plan]." J.A. 80.

Although the Employee Matters Agreement was not itself a governing plan document, the New Gannett Plan Document explicitly provided for the Employee Matters Agreement: "In connection with the Spin-off, [New Gannett] will enter into that certain Employee Matters Agreement with [TEGNA]." New Gannett Plan Document at 1. The New Gannett Plan Document further stated that that "[t]he Employee Matters Agreement may be used as an aid in interpreting the terms of the [spin-off] transitions described above." *Id.*

At the time of the spin-off in June 2015, the New Gannett Plan allegedly "held $269 million invested in TEGNA common stock, representing more than 21.7% of the Plan's total assets." J.A. 82. At the end of 2015, the Plan still held $178 million in TEGNA common stock (the price of which had fallen 19.3%, accounting for some of the decline). Then at the end of 2016, the Plan held over $115 million in TEGNA common stock. During that year, the share price had decreased a further 16%. Meanwhile, for two years after the spin-off, Defendants maintained the frozen holding pattern for the TEGNA Stock Fund before deciding in June 2017 to liquidate it over a twelve-month period beginning in July

---

[4] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

8

2017. Nevertheless, as of August 2018 (the date of Plaintiff's proposed Amended Complaint), the TEGNA Stock Fund had still not been fully liquidated.

Plaintiffs allege that between the time of the spin-off and the decision to liquidate the TEGNA Stock Fund, Defendant Gannett Benefit Plans Committee repeatedly received risk warnings related to holding large quantities of TEGNA stock. As early as August 2015, one member of the Committee received a letter from an investment firm alerting him that "the Plan had a 'significant holding' in TEGNA stock that was 'problematic.'" J.A. 82. And in 2015 and 2016 financial statements, auditors for the Plan reported that the TEGNA and New Gannett holdings "expose[d] the Plan to concentration risk." J.A. 85, 93. In mid-2016, a Committee member prepared a draft presentation and sent it to another Committee member, as well as New Gannett's CFO and General Counsel; this presentation recommended "evaluat[ing] a sunsetting process for eliminating the TEGNA Company Stock Fund." J.A. 85. For the rest of 2016, however, although the Committee reviewed other investment decisions with respect to the Plan's mutual funds, "the Committee did not consider liquidating the TEGNA Stock Fund." J.A. 85.

According to Plaintiffs, the problem with the TEGNA Stock Fund was that, as a single-stock fund, it was inherently unduly risky because it put all the eggs in one basket, thus violating the diversification principle of sound investment. This Court has previously noted the dangers of single-stock funds. *See, e.g.*, *DiFelice*, 497 F.3d at 424 ("[P]lacing retirement funds in *any* single-stock fund carries significant risk . . . ."). Plaintiffs further contend that maintaining the TEGNA Stock Fund was doubly problematic because the Plan also had another single-stock fund devoted to New Gannett stock, and the performances of

9

the TEGNA stock and the New Gannett stock were correlated, thus exacerbating the concentration issues. Despite the known issues with single-stock funds, however, the Committee allegedly accepted qualitatively less thorough reports from its investment consultant on the TEGNA Stock Fund, as compared to the reports provided by the same consultant on the other funds on the Plan's menu. Ultimately, the Committee took no steps to address liquidating the TEGNA Stock Fund until April 2017, when the Committee delegated investigating a sunset process to a newly formed subcommittee. On July 31, 2017, the Committee notified the Plan's participants that the TEGNA Stock Fund would be liquidated within a 12-month sunset period.

During the Committee's period of inaction, TEGNA stock prices fell. Plaintiffs calculate that the failure to promptly liquidate TEGNA stocks during the first half of 2016 cost the Plan between $43 million and $57 million, depending on how the funds might have been otherwise invested.

In March 2018, named plaintiff Jeffrey Quatrone filed a putative class action suit on behalf of the Plan against Defendants Gannett Co., Inc. and the Gannett Benefit Plans Committee.[5] Quatrone faulted Defendants for failing to respond to the warnings about the TEGNA Stock Fund. In Quatrone's view, Defendants ought to have been on notice the TEGNA Stock Fund should be divested due to the Employee Matters Agreement and should have discussed divestment as early as the spin-off. At minimum, though, Quatrone

---

[5] Plaintiff Quatrone's Complaint included John/Jane Doe Defendants representing individual members of the Gannett Benefit Plans Committee and any other possible individual fiduciaries of the plan, but Plaintiffs have since dropped their claims against the John/Jane Doe Defendants.

alleged that Defendants ought to have assessed whether the fund remained a prudent investment prior to April 2017, and that if Defendants had taken up the matter of the TEGNA Stock Fund, they would have recognized it was an imprudent, undiversified fund and would have been obligated to take immediate steps to sunset it. More precisely, the operative Complaint alleges that the Plan's fiduciaries should have made the liquidation decision and informed participants of liquidation by January 1, 2016, and the liquidation should have been completed six months later. This series of failures allegedly constituted breaches of Defendants' fiduciary duties of prudence and diversification.[6]

The district court dismissed the complaint under Fed. R. Civ. P. 12(b)(6). The district court's two key holdings were that (1) Plaintiffs' duty-of-prudence claims were barred under *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014), which raised the bar for pleading a breach of the duty of prudence related to the retention of publicly traded stock by requiring a plaintiff to allege "special circumstances" related to mistakes in market valuation not alleged here, and (2) the duty to diversify requires diversity among the full set of funds offered in the menu of plan offerings but does not compel every individual fund in a plan to be diversified.

Plaintiffs sought leave to amend the complaint. The proposed amendments added allegations based on some discovery and sought to substitute named Plaintiffs but did not alter the fundamental claims. The district court denied amendment as futile because the

---

[6] The complaint also alleged that Defendants breached the duty of loyalty, 29 U.S.C. § 1104(a)(1)(A), but the district court did not address whether the complaint plausibly pleaded such a breach, and Plaintiffs have not raised the duty of loyalty on appeal.

11

amended complaint "fail[ed] to address the deficiencies of the original complaint." J.A. 71. Specifically, the district court determined that the amended complaint still did not allege "special circumstances" and its diversification theory was still that the fiduciaries should have compelled participants to have diverse portfolios by forcing them out of an undiversified fund (i.e., divesting the TEGNA stock). J.A. 70-71.

Accordingly, on appeal we consider whether and how a participant in a defined contribution plan can allege a breach of the ERISA fiduciary duties of either prudence or diversification on the basis of a plan fiduciary's non-divestment of an allegedly imprudent frozen single-stock fund.

## II.

Where a district court denies a motion for leave to amend a complaint on grounds of futility, this Court employs the same standard that would apply in a review of a motion to dismiss. *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 274 (4th Cir. 2014). Therefore, this Court reviews de novo the district court's legal conclusion that the complaint failed to state a claim on which relief could be granted. *Id.* A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.

To state a claim for a breach of an ERISA fiduciary duty, "a plaintiff must plausibly allege that a fiduciary breached [a duty], causing a loss to the employee benefit plan." *Schweitzer*, 960 F.3d at 195; *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594

12

(8th Cir. 2009) ("[A] plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." (citing *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000))).

Here, Plaintiffs' claims turn on alleged breaches of the duty of prudence, 29 U.S.C. § 1104(a)(1)(B), and the duty to diversify, *id.* § 1104(a)(1)(C). The duty of prudence requires a fiduciary to discharge their duties with respect to the plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). This means that a fiduciary must "give[] appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved." 29 C.F.R. § 2550.404a-1(b)(1)(i). The duty to diversify requires a fiduciary to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C).

Of those two duties, Plaintiffs focus on the duty of prudence because, although ERISA has a statutory duty to diversify in § 1104(a)(1)(C), the § 1104(a)(1)(B) duty of prudence has an included duty to diversify as well.[7] *See Armstrong v. LaSalle Bank Nat'l*

---

[7] Between § 1104(a)(1)(B) and § 1104(a)(1)(C), ERISA has a somewhat circular structure. Prudence includes diversification, and diversification references prudence. Accordingly, while classifying a claim that an investment decision was imprudent for want of diversification as either a prudence claim or a diversification claim is analytically useful, each duty implicates the other. Although the dissent argues our analysis inappropriately merges these duties, *post* at 35, other courts have acknowledged that the duties overlap.

13

*Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006) ("The duty to diversify is an essential element of the ordinary trustee's duty of prudence . . . ."). Relevant to this case, the duty of prudence also includes a duty to monitor investments and remove imprudent investments. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

Plaintiffs' claims are simple: the TEGNA Stock Fund was an imprudent investment, Defendants failed to monitor the TEGNA Stock Fund, and their failure to monitor the imprudent investment led to a failure to remove it, thereby causing a loss to the Plan. However, this case is not simple. Defendants argue that *Dudenhoeffer* requires a plaintiff to additionally plead "special circumstances" in order to state a claim that an investment was imprudent for want of diversification. *See* 134 S. Ct. at 2471. Defendants also contend that, because the Plan was of the defined contribution type, individual participants could choose how to allocate their own funds, thereby absolving fiduciaries of any responsibility for not divesting imprudent funds that are frozen to new investments. Addressing a case with near-identical facts and claims earlier this year, the Fifth Circuit rejected the first argument (*Dudenhoeffer*), but accepted the second argument (participant-choice). *Schweitzer*, 960 F.3d at 197-99. We agree with the Fifth Circuit as to *Dudenhoeffer* but

---

*See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1278 (11th Cir. 2012) ("[T]he duty of prudence the statute imposes requires diversification of investments to lower risk.") *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459); *Peabody v. Davis*, 636 F.3d 368, 374 (7th Cir. 2011) (discussing judicial efforts to "reconcile[]" the two duties when prudence applies but diversification, by statute, does not); *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003) (Posner, J.) (noting that the duty of prudence can become a duty to diversify and bring diversification "in . . . by the back door," and collecting cases).

disagree as to the effect of participant choice on a fiduciary's duties with respect to a defined contribution plan.

Accordingly, we conclude that Plaintiffs have stated a claim, and we reject Defendants' arguments that various considerations apply to bar Plaintiffs' claim at the motion to dismiss stage of litigation.

A.

Our analysis begins with the duty of prudence. ERISA's duty of prudence draws from the common law of trusts and has several sub-duties. Relevant to this case are the included duties of investigation, monitoring, and diversification.

We start with the duty to investigate. "Although not set out verbatim in the statute, a generally recognized duty of a [p]lan fiduciary under [§ 1104(a)(1)(B)] includes that of investigating and reviewing investment options for an ERISA plan's assets." *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 216 (4th Cir. 2011). To enforce this duty, "the court focuses not only on the merits of [a] transaction, but also on the thoroughness of the investigation into the merits of [that] transaction." *DiFelice*, 497 F.3d at 418 (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)). Put another way, where a plaintiff alleges an imprudent investment decision, "courts measure [the] 'prudence' requirement . . . [by] focusing on a fiduciary's conduct in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996); *see also id.* (collecting cases).

15

We next turn to the duty to monitor, which is an extension of the duty to investigate. Once fiduciaries have made the initial investigation and added an investment to a plan, there is a "continuing duty to monitor" that investment. *Tibble*, 135 S. Ct. at 1828; *see also DiFelice*, 497 F.3d at 423. If monitoring reveals that the investment is imprudent, a fiduciary must remove the investment. *Tibble*, 135 S. Ct. at 1828. What counts as an imprudent investment that must be removed depends on the circumstances. In *Tibble*, the fiduciaries offered high-fee, retail-class mutual funds on a defined contribution plan menu when identical lower-fee, institutional-class mutual funds were available. *Id.* at 1826. Because the retail-class funds were more expensive to participants, the participants alleged that they were imprudent. *Id.* In this case, Plaintiffs allege that the TEGNA Stock Fund was imprudent because it was a single-stock fund with high concentration risk. This brings us to the duty to diversify.

Much ink has been spilled on the prudence of investing in single-stock funds such as the TEGNA Stock Fund. Prudence entails appropriate caution, but *all* investments involve some degree of risk. Restatement (Third) of Trusts § 90 cmt. e(1). In a "diversified" portfolio, that is, one which contains a variety of investments, "the risks of the various components of such a portfolio tend to cancel out; that is the meaning and objective of diversification." *Summers v. State St. Bank & Tr. Co.*, 453 F.3d 404, 409 (7th Cir. 2006). Accordingly, ERISA fiduciaries "have a duty of diversification as part of their overall duty of prudence." *Id.* Because single-stock funds are, by definition, not diversified, this Court has observed that they "would seem generally imprudent for ERISA purposes." *DiFelice*, 497 F.3d at 424 (emphasis omitted). Indeed, diversification is so important that, in addition

16

to the duty of diversification imposed by the duty of prudence, ERISA also codifies a freestanding duty of diversification, 29 U.S.C. § 1104(a)(1)(C), addressed below in Section III.B.

Because single-stock funds are often disfavored, we pause to address the origin of the TEGNA Stock Fund, which relates back to pre-spin-off Old Gannett stock. Despite the risks, Congress has sanctioned one particular kind of single-stock investment, the Employee Stock Ownership Plan ("ESOP"). *Dudenhoeffer*, 134 S. Ct. at 2465-66. ESOPs exist to primarily invest in employer stock and are permissible because ERISA provides that acquiring or holding employer stock does not violate a fiduciary's duties of diversification or prudence (to the extent prudence requires diversification). 29 U.S.C. § 1104(a)(2). As employer stock, Old Gannett stock in the Old Gannett plan pre-spin-off would have been subject to less scrutiny than the stock of another company.

But post-spin-off is a different situation. We are aware of only one court of appeals that has addressed whether, post-spin-off, the TEGNA stock in the New Gannett Plan might also be employer stock and exempt from prudence and diversification requirements—and that court held such stock is not employer stock post-spin-off. *Schweitzer*, 960 F.3d at 195. Because of that persuasive authority, because the New Gannett Plan Document stated that "stock of TEGNA Inc. will not constitute Employer Stock" after the spin-off, and because Defendants have not argued the TEGNA stock qualified for employer stock treatment, we assume that it did not. New Gannett Plan Document § 1.22. Accordingly, Plaintiffs contend that Defendants' duty to monitor and remove the TEGNA Stock Fund was triggered at the time of the spin-off. *Cf.* Restatement (Third) of Trusts § 92 ("The trustee has a duty, within

17

a reasonable time after the creation of the trust, to review the contents of the trust estate and to make and implement decisions concerning the retention and disposition of original investments . . . .").[8]

Following the foregoing principles, Plaintiffs allege that Defendants breached their duty of prudence because they did not monitor and remove the allegedly imprudent TEGNA Stock Fund. Plaintiffs' claims of failure to monitor stem from the allegations that two years elapsed where Defendants did not address the TEGNA Stock Fund, even though: (1) Defendants could have been on notice that the TEGNA Stock Fund was problematic because of the Employee Matters Agreement that called for liquidation; (2) Defendants received risk warnings from auditors; and (3) the TEGNA stock came into the plan under unique circumstances. Plaintiffs' allegations that the fund was imprudent are based on its non-diversification (a problem which the Plan's other single-stock fund, which held New Gannett stock, exacerbated). Plaintiffs claim that had the Defendants monitored and removed the imprudent investment, the Plan and its participants would be better off now to the tune of tens of millions of dollars. We find these allegations sufficient to state a claim for a breach of the duty of prudence.

---

[8] As to what a "reasonable time" would be in this case, the Restatement explains that "[n]o positive rule can be stated with respect to what constitutes a reasonable time." Restatement (Third) of Trusts § 92 cmt. b. Prudent timing of the disposition of improper inception assets depends on many factors. *Id.* Here, Plaintiffs have alleged nearly two years elapsed after the spin-off before the Committee created a subcommittee to investigate sunsetting the TEGNA Stock Fund. A two-year delay is plausibly unreasonable, especially given that the single-stock TEGNA Stock Fund did not become any more or less diversified in that time.

18

Our analysis, however, cannot end there. Defendants raise several unsuccessful arguments as to why the facts of this case call for the application of different rules than the ones discussed above. We address each argument in turn.

B.

Attacking the legal foundation of Plaintiffs' claim, Defendants contend that in a defined contribution plan a fiduciary is not obligated to ensure individual funds are diversified so long as the plan's menu allows participants to choose between a mix of options; diversification must be judged at the plan level rather than the fund level. In other words, regardless of the thoroughness of monitoring, it was not inappropriate to have the TEGNA Stock Fund in the Plan. Binding precedent in this Circuit forecloses this argument, which turns on the false premise that the § 1104(1)(C) duty to diversify can eclipse the § 1104(a)(1)(B) duty of prudence.

The leading case is *DiFelice*, in which this Court considered a plan with a menu of funds and held that "*each* available [f]und considered on its own" must be prudent. *DiFelice*, 497 F.3d at 423 (emphasis in original). This holding applies regardless of whether the menu contains "other funds, which individuals may *or may not* elect to combine with a [single-stock] fund . . . [to] create a prudent portfolio." *Id.* If it were otherwise, "[a]ny participant-driven 401(k) plan . . . would be prudent . . . so long as a fiduciary could argue that a participant could, and should, have further diversified his risk," but that result is "perverse." *Id.* at 424.

From *DiFelice*, it follows that each available fund on a menu must be prudently diversified. As discussed above, diversification is a component of prudence. *See*

19

*Armstrong*, 446 F.3d at 732; *see also Summers*, 453 F.3d at 406 (calling the duty to diversify an "included" duty in the duty of prudence). Accordingly, if the duty of prudence applies, then so does the duty of prudence's included duty of diversification. After all, the point of the duty to diversify is not diversification for diversification's sake, but risk management.[9]

The text of ERISA compels this conclusion as well. Regarding the abrogation of fiduciary duties with respect to employer stock, ERISA states, "the diversification requirement of [§ 1104(a)](1)(C) and the prudence requirement (only to the extent that it requires diversification) of [§ 1104(a)](1)(B) is not violated by acquisition or holding of . . . qualifying employer securities." 29 U.S.C. § 1104(a)(2). This language explicitly indicates that "the prudence requirement" normally "requires diversification." *Id.*

---

[9] The dissent objects that our opinion creates a per se rule against single-stock, non-employer funds. *See post* at 42. In the context of the case before us, the dissent's objection is premature. We are at the motion to dismiss stage, where we take allegations as true and hold claims to a plausibility standard. The requirement that a fiduciary prudently diversify a fund means that the fiduciary must undertake an appropriate investigation and implement whatever risk management steps, e.g., diversification, that the investigation reveals to be prudent. We note that this Court has previously recognized that "an investment . . . , made *upon appropriate consideration of the surrounding facts and circumstances*, should not be deemed to be imprudent merely because the investment, standing alone, would have . . . a relatively high degree of risk." *Tatum*, 761 F.3d at 367 (quoting Investment of Plan Assets under the "Prudence" Rule, 44 Fed.Reg. 37,221, 37,224 (June 26, 1979)) (emphasis in *Tatum*). Here, we have taken as true—because of the allegations, not because of a per se rule—that there was a single-stock fund with a relatively high degree of risk and a failure to consider the surrounding facts and circumstances. Accordingly, we do not address whether the fiduciaries would ultimately be liable if they later prove either that they did undertake a thorough investigation, or that a hypothetical prudent fiduciary would have retained the TEGNA Stock Fund in its undiversified form had such a hypothetical prudent fiduciary investigated.

Nevertheless, Defendants argue that *DiFelice* addressed prudence only and cannot be extended to diversification. Defendants argue that "the duty of diversification, in contrast [to the duty of prudence's analysis of each fund individually], involves the mix of funds available [in a plan menu]." Appellees' Br. at 16 (citing *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (unpublished) (holding that allegations that specific funds in a plan were undiversified were insufficient to state a claim absent allegations that the plan was undiversified as a whole)). The district court agreed with Defendants.

This argument relies on separating the duty of prudence codified at § 1104(a)(1)(B) from the duty of diversification codified at § 1104(a)(1)(C), and then substituting the requirements of § 1104(a)(1)(C) for those of § 1104(a)(1)(B). However, given that trust law, ERISA case law, and the text of ERISA all understand diversification as an element of prudence, we cannot accept this argument. *See* Restatement (Third) of Trusts § 90 cmt. e(1); *Armstrong*, 446 F.3d at 732; 29 U.S.C. § 1104(a)(2).

This is not to say that § 1104(a)(1)(B) and § 1104(a)(1)(C) are identical duties. Nor is it to say that Plaintiffs here failed to state a claim that the Defendants breached their § 1104(a)(1)(C) duty of diversification.

First addressing the distinction between § 1104(a)(1)(B) and § 1104(a)(1)(C), we examine the Second Circuit case that Defendants cite, *Young v. General Motors*. This unpublished case addressed the § 1104(a)(1)(C) duty of diversification as applied to a defined contribution plan, and held that the duty "contemplates a failure to diversify claim

21

when a plan is undiversified as a whole," and that allegations that "individual funds within the plan were undiversified" were insufficient to state a claim. *Young*, 325 F. App'x at 33.

Returning to ERISA's employer stock rule, the text of the statute exempts employer stock from both the § 1104(a)(1)(C) duty of diversification *and* the § 1104(a)(1)(B) duty of prudence to the extent it requires diversification. Accordingly, even assuming the Second Circuit was correct that § 1104(a)(1)(C) does not extend down to the fund level, and that we should instead seek diversity across the menu of funds in the plan, we may distinguish that case as not addressing § 1104(a)(1)(B)'s requirement of prudence. *Cf. Tatum*, 761 F.3d at 380 ("Although ERISA does not in so many words require every fund in an investment plan to be fully diversified, each fund, when considered individually, must be prudent.") (Wilkinson, J., dissenting).

That said, Plaintiffs *do* argue that there was a failure to diversify at a plan level, not just at a fund level. Plaintiffs contend that because the New Gannett Plan had a New Gannett ESOP on its menu as well as the TEGNA Stock Fund, and because New Gannett and TEGNA are in the same sector and tend to rise and fall together, the interplay between the two single-stock funds caused the Plan overall to have a diversification problem. Plaintiffs' claim thus passes muster even under *Young*. It also falls within our precedents. We have previously recognized that the prudence of investing in one single-stock fund can be impacted by the trials and tribulations of another single-stock fund where the funds each hold stock in formerly related companies, and that such a situation implicates the duty of diversification under § 1104(a)(1)(C). *See Tatum v. RJR Pension Inv. Comm.*, 855 F.3d

22

553, 566-67 (4th Cir. 2017). Accordingly, Plaintiffs' correlation theory plausibly states a claim for a breach of the duty of diversification under § 1104(a)(1)(C).[10]

### C.

Having established that a single fund on a menu, such as the TEGNA Stock Fund, can be scrutinized for imprudence for want of diversification, we next turn to whether a fiduciary is obligated to divest a non-diversified fund. Defendants contend that since the TEGNA Stock Fund was frozen to new investments and participants were able to leave the fund on their own initiative, no further action was required. This line of thinking supposes a per se rule that a fiduciary will *never* be required to divest a fund in a defined contribution plan, although that may be an available option.

Again, binding precedent in this Circuit forecloses this argument. While merely freezing the fund may be prudent in some cases, in other cases prudence may compel divestment on a reasonable timeline and freezing the fund to new investments will not be

---

[10] We express no opinion on other situations where, for instance, there are single-stock funds for companies that have never been related. Furthermore, the dissent notes, correctly, that it is difficult to blame alleged overconcentration in a fund or funds in a defined contribution plan menu on a fiduciary because of potential intervening participant choice. *Post* at 44 ("[T]hat the Plan may have been concentrated in . . . one sector does not reflect a breach of any duty . . . . [I]t merely reflects individual Plan participants' decisions as to how to allocate their own investments."). Accordingly, we emphasize that the § 1104(a)(1)(C) diversification claim here turns on fund selection. This is not to say that a fiduciary's fund selection will never need to account for whether participants have overconcentrated themselves in one fund. But it is to agree with the dissent that investment volume alone is not the applicable test for a breach of duty here. That said, the dissent's assertion that "the cause of any overconcentration in TEGNA stock was individual Plan participants' decisions to retain their assets in the TEGNA Stock Fund," *post* at 40, is a double-edged sword: the fiduciaries also had the power to divest but did not exercise it; but unlike the participants, the fiduciaries were under an obligation to act prudently.

23

enough. *Cf.* Restatement (Third) of Trusts § 92 cmt. d ("[An] authorization to retain [an investment that was part of the trust property at the time of the creation of the trust] . . . ordinarily does not justify the trustee in retaining such assets if, under the circumstances, retention would be imprudent.").

This Court previously addressed the divestment of a frozen fund in a defined contribution plan in *Tatum v. RJR Pension Investment Committee*—in fact, this Court addressed *Tatum* three times. *See Tatum v. R.J. Reynolds Tobacco Co.*, 392 F.3d 636 (4th Cir. 2004) ("*Tatum I*"); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346 (4th Cir. 2014) ("*Tatum II*"); *Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553 (4th Cir. 2017) ("*Tatum III*").

The facts of *Tatum* were the inverse of those here. In *Tatum*, there was a frozen single-stock fund created by a spin-off, and the *Tatum* plaintiffs sued because plan fiduciaries *did* divest it. *See Tatum II*, 761 F.3d at 351-55. After a bench trial, the district court found that although the *Tatum* fiduciaries had breached their duty of procedural prudence by not undertaking a thorough investigation prior to divesting the fund six months after the spin-off, they were not liable because a prudent fiduciary *could have* made the same decision to divest after performing a proper investigation. *Id.* at 351. This Court remanded for the district court to instead apply a *would have* standard. *Id.* at 368-69. The district court subsequently determined that a prudent fiduciary *would have* divested the stock, and we affirmed. *Tatum III*, 855 F.3d at 556.

*Tatum* demonstrates that fiduciaries of defined contribution plans have the power to force divestment and that, in some circumstances, forcing divestment is the objectively

24

prudent thing to do even if the fund is frozen. *See Tatum II*, 761 F.3d at 363 (discussing "objective prudence"). Accordingly, in this case, where Plaintiffs allege Defendants did not take up the matter of retaining a single-stock fund in the Plan for nearly two years after it lost its employer stock exemption, it is eminently plausible that a hypothetical prudent fiduciary who did investigate the fund in that time would have begun the divestment process earlier. Indeed, the dissenting opinion in *Tatum II* observed that, "[h]ad the plan fiduciaries failed to diversify and the . . . stocks had continued to decline, the fiduciaries would have been sued for *keeping* the stocks." *Id.* at 381 (Wilkinson, J., dissenting); *see also Tibble*, 135 S. Ct. at 1828-29 (discussing duty to "monitor investments and *remove* imprudent ones" in a defined contribution plan (emphasis added)); *DiFelice*, 497 F.3d at 420 (explaining the relevant inquiry "when plaintiffs allege . . . a fiduciary's *failure* to engage in a transaction, such as *removal* . . . of a company fund" (second emphasis added)).

We further note that if we were to hold that there can never be liability for failure to force divestment of a frozen fund in a defined contribution plan, there would be a gross liability asymmetry in this Circuit due to *Tatum*. The finding in *Tatum* that a prudent fiduciary *would have* forced divestment sets the divestment decision on a high pedestal compared to any alternative. Effectively, the *Tatum* defendants were ultimately not liable because they proved they did the objectively right thing. However, the litigation dragged on for nearly fifteen years. If freezing the fund and walking away means a plaintiff can never state a claim and that fiduciaries always prevail on a motion to dismiss, no reasonable fiduciary would ever do as the fiduciaries in *Tatum* did—that is, no fiduciary in the *Tatum* situation will ever do the right thing. Plan fiduciaries should be guided by prudence, not

25

the calculus of litigation costs. Accordingly, a bright line rule that a fiduciary of a defined contribution plan will never be obligated to divest an imprudent but frozen fund is unwise.

D.

Defendants also argue that where participants in a defined contribution plan hold legacy previous-employer stock in a frozen single-stock fund, those participants should have the freedom to stay invested in the fund and thus accept a higher risk to potentially reap a higher reward.[11] In *Schweitzer*, the Fifth Circuit adopted a variation of this position, positing that "[w]ith a rising market, [participants] chose to retain the [legacy single-stock fund] for over two years, balancing the risk of a want of portfolio diversity against the rising values of [the legacy stock]." 960 F.3d at 199. The Fifth Circuit concluded that where a fund is frozen, participants may divest if they choose to, and the plan distributes statutorily mandated warnings that portfolios are better if diversified, a plaintiff cannot state a claim that alleges a fiduciary should have forced divestment. *Id.*

Empirical evidence and general investment principles undermine these arguments, which, at bottom, are contrary to the statutory structure of ERISA because the claim that intervening participant choice should relieve a fiduciary of liability for a breach is an affirmative defense that courts do not consider at the motion to dismiss stage. *Pfeil v. State*

---

[11] Defendants also contend that "everyone agrees [the TEGNA stock investment] was prudent when the investment was initially made." Appellees' Br. at 18. Because the TEGNA stock was the legacy of an employer stock investment, and because the complaint from which we draw the facts on a motion to dismiss does not make an allegation about the initial prudence of the TEGNA investment, we cannot assume that "everyone agrees" the investment was prudent in the first instance.

*St. Bank & Tr. Co.*, 671 F.3d 585, 598 (6th Cir. 2012), *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459.

i.

We begin with the contention that participants in a plan will balance the concentration risk of a single-stock fund against the potential for a high return. Perhaps participants in the New Gannett Plan did this, but perhaps they did not—and it is inappropriate to assume they did at the motion to dismiss stage of litigation.

First, that participants affirmatively balance risk and choose to retain funds under such circumstances is a dubious assertion. *See Tatum II*, 761 F.3d at 380 ("[O]nce plan participants allocate their assets among various funds, there is a substantial risk that inertia will keep them from carefully monitoring and reallocating their retirement savings to take into account changing risks.") (Wilkinson, J., dissenting). Empirical evidence shows that employees in defined contribution plans "often follow the path of least resistance" and "[a]lmost always, the easiest thing to do is nothing whatsoever." James J. Choi, David Laibson, Brigitte C. Madrian & Andrew Metrick, *Defined Contribution Pensions: Plan Rules, Participant Choices, and the Path of Least Resistance*, 16 Tax Pol'y & Econ. 67, 70 (2002). Accordingly, while some participants may have decided they wished to stay invested in the TEGNA Stock Fund, it is a stretch to assume that they did.

Furthermore, returning to why diversification is desirable, the essence of diversification is that a diversified portfolio is superior to a non-diversified portfolio because a diversified portfolio can achieve the same expected return as an un-diversified portfolio, but the diversified portfolio will be less risky. *See* Edward C. Halbach, Jr., *Trust*

27

*Investment Law in the Third Restatement*, 77 Iowa L. Rev. 1151, 1166 (1992). Diversification minimizes so-called "uncompensated risk." The "uncompensated" moniker highlights that such risk is not "compensated" by a better expected return. *See* Restatement (Third) of Trusts, § 90 cmt. e(1) ("Because market pricing cannot be expected to recognize and reward a particular investor's failure to diversify, a trustee's acceptance of this type of risk cannot, without more, be justified on grounds of enhancing expected return."); *see also* Unif. Prudent Inv'r Act, cmt. to § 3 (Unif. Law Comm'n 1994) (explaining that diversification minimizes uncompensated risk). Thus, it is not clear what "potentially . . . higher reward" Defendants contend participants could choose to pursue in exchange for bearing the higher risk of the TEGNA Stock Fund. Appellees' Br. at 18.

Of course, participants in a plan may make idiosyncratic decisions, and the ability of a participant to calibrate their retirement investing based on their individual situation is one of the virtues of the defined contribution plan structure. *See* James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 522 (2013). Accordingly, while some plan participants in this case may have decided for themselves to stay invested in the TEGNA Stock Fund, we should not prospectively assume this occurred.

ii.

We next turn to the appropriate way to account for participant choice (if there was such choice) when a fiduciary is sued for a breach of a duty that caused a loss to the plan, but some of the loss may have been caused by participants. In the words of the Fifth Circuit, plan participants "cannot enjoy their autonomy and [then] blame the [f]iduciaries for declining to second guess that judgment." *Schweitzer*, 960 F.3d at 199. The Fifth Circuit is

28

generally correct that fiduciaries should not be liable for participant autonomy, but we disagree with that court on whether a defendant may invoke that autonomy in a motion to dismiss.

In *Tatum II*, we noted that the "legislative history and federal regulations clarify that the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds." 761 F.3d at 356. In a footnote, we then quoted the legislative history for 29 U.S.C. § 1104(c) and cited the corresponding regulation from the Department of Labor, 29 C.F.R. § 2550.404c-1. Section § 1104(c), more commonly known by its ERISA number, § 404(c), is a safe harbor provision that shields fiduciaries of defined contribution plans from liability where a loss "results from [a] participant's . . . exercise of control." 29 U.S.C. § 1104(c)(1)(A)(ii). Accordingly, "if the participant instructs the plan trustee to invest the full balance of his account in, e.g., a single stock, the trustee is not to be liable for any loss because . . . the investment does not meet the prudent man standards." *Tatum II*, 761 F.3d at 356 n.5 (quoting H.R. Rep. No. 93-1280, at 305 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5085-86). In order to qualify for this safe harbor, however, a plan must be more than simply a generic defined contribution plan. Instead, the plan must satisfy the intricate requirements of 29 C.F.R. § 2550.404c-1.

Counting over twenty-five requirements that a fiduciary must meet before invoking the § 404(c) safe harbor, the Sixth Circuit held this section "is an affirmative defense that is not appropriate for consideration on a motion to dismiss when, as here, the plaintiffs did not raise it in the complaint." *Pfeil*, 671 F.3d at 598. Other courts of appeals have held

similarly. *See Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009); *Allison v. Bank One-Denver*, 289 F.3d 1223, 1238 (10th Cir. 2002); *In re Unisys*, 74 F.3d at 446. Because the § 404(c) affirmative defense is custom-tailored to the issue of participant choice in a defined contribution plan, we conclude that the fiduciary of a defined contribution plan should not have the benefit of safe harbor on account of participant choice without proving the § 404(c) defense first. In other words, as-yet-unproven participant choice does not abrogate a fiduciary's duties such that a plaintiff fails to state a claim where the plaintiff attacks the prudence of an option on a plan's menu.[12]

E.

Finally, we turn to *Dudenhoeffer*. 134 S. Ct. 2459. In *Dudenhoeffer*, plan participants in an ESOP filed a lawsuit alleging that plan fiduciaries breached their duty of prudence by continuing to buy and hold employer stock when they should have known that the stock was "overvalued and excessively risky." *Id.* at 2464. The participants claimed that the fiduciaries should have known this due to publicly available information. *Id.* For example, they argued that the fiduciaries could have understood from newspaper articles that the value of the employer stock was decreasing and would continue to decrease, and

---

[12] *DiFelice* supports our conclusion. In that case, we held that even where a plan comports with § 404(c), "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may *or may not* elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio." 497 F.3d at 423. Accordingly, it is even less appropriate that a fiduciary escape its duty by invoking participant autonomy even before proving that a plan comported with § 404(c). *See also Peabody*, 636 F.3d at 376-77 (holding fiduciaries breached duty of prudence where they allowed a participant in a defined contribution plan to "remain invested exclusively in [closely-held employer] stock during the company's decline," and the fiduciaries did not prove § 404(c) defense or justify their failure to divest from the stock).

that the fiduciaries should have acted on that prediction by selling the stock, ceasing to purchase more of it, canceling the ESOP, or disclosing insider information "so that the market would adjust its valuation of [the] stock downward." *Id.*; *see id.* at 2471. The Court rejected this argument, explaining that, like other investors, ERISA fiduciaries may prudently "rely on [a] security's market price as an unbiased assessment of the security's value in light of all public information."[13] *Id.* at 2471 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2411 (2014)). Therefore, it is "implausible as a general rule" that a "fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock . . . , at least in the absence of special circumstances." *Id.* Accordingly, *Dudenhoeffer* forecloses claims that fiduciaries should have outsmarted an efficient market, although it leaves the door ajar if there were "a special circumstance affecting the reliability of the market price." *Id.* at 2472.

But Plaintiffs do not contend that fiduciaries should have outsmarted an efficient market. A claim that a fund was imprudent due to lack of diversification does not turn on reading tea leaves to predict the *performance* of a stock—what *Dudenhoeffer* forecloses as a basis for liability. Instead, Plaintiffs allege that their fiduciaries should have recognized

---

[13] The Court's holding endorsed the efficient market hypothesis. *Dudenhoeffer*, 134 S. Ct. at 2472 ("[F]ail[ure] to outsmart a presumptively efficient market . . . [is] not a sound basis for imposing liability." (citation omitted)). The efficient market hypothesis supposes that "markets for widely-traded stock . . . are efficient and impound all publicly available information." *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 992 (7th Cir. 2013) (quoting *Nelson v. Hodowal*, 512 F.3d 347, 350 (7th Cir. 2008)), *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459). Under this framework, "stock prices in efficient markets do not reflect risks that an investor could eliminate through diversification." *Schweitzer*, at 960 F.3d at 197 n.36.

the imprudence of a fund based on the fund's *composition*.[14] It is true that a fund's

composition might be informed by publicly available information about the stocks that it

contains and therefore that a plaintiff's allegations might reference such publicly available

information. But those references do not shift an imprudent non-diversification claim into

the ambit of *Dudenhoeffer*. *See Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 389 (6th

Cir. 2015) ("One can concede that the market is generally efficient in pricing stocks without

concluding that all decisions to buy, sell or hold are therefore prudent.") (White, J.,

dissenting); *cf. Summers*, 453 F.3d at 410-11 (Posner, J.) (suggesting that a change in the

debt-equity ratio of an employer's stock on account of a plummeting stock price or a

merger might require diversification of an ESOP under the duty of prudence). We therefore

conclude that *Dudenhoeffer* does not apply to Plaintiffs' allegations.

## IV.

We pause now to recapitulate Plaintiffs' claims. Again, to state a claim for a breach

of an ERISA fiduciary duty, "a plaintiff must plausibly allege that a fiduciary breached [a

duty], causing a loss to the employee benefit plan." *Schweitzer*, 960 F.3d at 195.

Here, Plaintiffs allege that Defendants breached their duty of prudence. Defendants

allegedly breached this duty by failing to monitor the continuing prudence of holding a

---

[14] We further observe that *Dudenhoeffer* related to an ESOP option in a defined contribution plan. 134 S. Ct. at 1463-64. As previously noted, "ESOPs expose retirees to great risk," but these "evils . . . are endemic to the ESOP form established by Congress." *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 861 (6th Cir. 2017) (quoting *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 387 (6th Cir. 2015)). Because employer stock enjoys an exemption from the diversification requirements of both § 1104(a)(1)(B) and § 1104(a)(1)(C), we are wary of looking to ESOP litigation for guidance where, as here, a plaintiff alleges a failure to diversify a fund consisting of non-employer stock.

32

single-stock fund. Because Defendants did not monitor the merits of the fund, they did not uncover that it was an imprudent fund. As the fund was a single-stock fund with inherent concentration risk, it is plausible that the fund was, in fact, imprudent. Simultaneously, the allegedly imprudent single-stock fund was correlated with another single-stock fund on the Plan's menu, intensifying diversification concerns. Defendants' failure to discover the imprudence led to another failure, a failure to divest the fund. Since the fiduciaries did not divest the fund, when the price of the stock in the fund went down, the Plan suffered a loss.

As we have explained, *DiFelice* authorizes examining the prudence of a fund standing alone from the other offerings on a plan's menu. That case also requires a fiduciary to identify and remedy imprudent funds on a menu. *Tatum* then shows that maintaining an allegedly imprudent fund in a frozen state is not necessarily adequate—indeed, the outcome of *Tatum* suggests that a prudent fiduciary would have near-immediately moved to sunset the single-stock fund. Accordingly, Plaintiffs have plausibly alleged Defendants breached their duty of prudence and caused a loss to the Plan.

Finally, neither *Dudenhoeffer* nor participant choice structure bar the above claim. *Dudenhoeffer* is simply inapposite. And as for participant choice, ERISA accounts for that choice with the situational safe harbor of § 404(c)—but that does not affect whether Plaintiffs here have stated a claim.

For the foregoing reasons, we vacate the judgment of the district court and remand for further proceedings.

*VACATED AND REMANDED*

33

NIEMEYER, Circuit Judge, dissenting:

The Gannett Co., Inc. 401(k) Savings Plan (the "Gannett Plan"), a defined contribution plan, offered its participants a menu of investments ranging in type and level of diversification, thus giving the participants choices from which they could build their individual investment portfolios. Among those options was a fund consisting of only one publicly traded stock — TEGNA Inc. In the time frame relevant to this appeal, the TEGNA Stock Fund accounted for as much as 20% of the value of all investments held by the Plan.

Jeffrey Quatrone, a participant in the Gannett Plan who had invested in the TEGNA Stock Fund, commenced this putative class action under the Employee Retirement Income Security Act of 1974 ("ERISA") against the Plan's alleged fiduciaries, claiming damages resulting from a drop in the market price of TEGNA stock. He alleged that the Plan's fiduciaries violated the ERISA duty of "diversification" by allowing the value of the TEGNA Stock Fund to constitute over 20% of all the Plan's investments and that they violated the duty of "prudence" by retaining, in light of known risks, the TEGNA Stock Fund as an option for investment in the Plan.

The district court, in a well-reasoned opinion, concluded that Quatrone failed to state plausible claims. It dismissed the diversification-duty claim by reasoning that, notwithstanding the undiversified nature of the TEGNA Stock Fund component, "*the Plan as a whole* was comprised of various options for the participants to select." (Emphasis added). The court explained that Quatrone's diversification claim was in effect a claim that the Plan's fiduciaries should have "force[d] the participants to diversify their investments." And it dismissed the prudence-duty claim in light of the Supreme Court's

34

decision in *Fifth Third Bancorp. v. Dudenhoeffer*, 573 U.S. 409, 426 (2014), which held that, as a general rule, "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible."

I agree with the district court's irresistible reasoning, which the majority opinion simply sidesteps with a myopic analysis. Specifically, the majority merges the duties of diversification and prudence and then erroneously focuses on *a single investment option* on the Plan's diversified menu in concluding that the complaint adequately alleged breach of these duties. It also fails to account for the fact that the participants were given free rein to diversify their individual accounts. The result of the majority's approach is a mechanically derived holding that is divorced from common sense and that will unnecessarily restrict the options offered in defined contribution plans.

I

Before splitting into two companies, Gannett Co., Inc. was engaged in the businesses of publishing and broadcasting. In June 2015, however, it spun off its publishing operation, transferring the relevant assets to a newly formed company, which it named Gannett Co., Inc. ("New Gannett"). The original Gannett company then renamed itself TEGNA Inc. New Gannett and TEGNA are both publicly traded companies.

The original Gannett company sponsored the Gannett Plan, a 401(k) defined contribution plan, for its employees. In a defined contribution plan, the plan maintains an individual account for each participant, and the benefits to the participant are limited to the

35

value of that account, over which the participant exercises control. *See* 29 U.S.C. § 1002(34) (defining "defined contribution plan"). The Gannett Plan's terms make this explicit, providing that, "all amounts allocated to a Participant's accounts shall be *subject to the investment direction of the Participant* as provided in this Section. For this purpose, the Trustee shall establish investment funds as designated by the [Gannett Plan] Committee." (Emphasis added). Accordingly, the Gannett Plan offered a menu of options from which participants could select to allocate their contributions. As the Plan provides,

> Each Participant upon commencement of participation in the Plan shall elect how the Participant's contributions are to be invested among the available investment choices. Once made, a Participant's elections shall remain in effect until a new election is made. A Participant may change investment elections as to current and future Employee contributions as of any dates that may be specified by the [Gannett Plan] Committee.

One option offered by the Gannett Plan was investment in a fund that held only the stock of the original Gannett company. After the original Gannett company spun off the new company, New Gannett assumed sponsorship of the Plan. Under its sponsorship, the Gannett Plan continued to hold as an option for investment the stock of the original company — with the name change, the TEGNA Stock Fund. As a result, the employees of New Gannett who had participated in the Gannett Plan prior to the spinoff continued to have the option to maintain their investments in the TEGNA Stock Fund, even though, after the split, they were no longer employees of the original Gannett company. At the time of the spinoff, over 20% of the Gannett Plan's assets were invested in the TEGNA Stock Fund.

After the spinoff — presumably because New Gannett employees were no longer connected to TEGNA — the Gannett Plan froze investments in the TEGNA Stock Fund, thus effectively reducing its holdings of TEGNA stock; participants could no longer allocate contributions to the TEGNA Stock Fund, but they could reduce or cash-out their investments in that Fund. The Gannett Plan, however, never *required* participants to divest themselves of their holdings in the TEGNA Stock Fund.

In late 2015 and 2016, investment banks began publicly to "downgrade" or become "bearish" about TEGNA common stock. Nonetheless, the Gannett Plan fiduciaries took no specific action to remove the TEGNA Stock Fund option or somehow divest the Plan of TEGNA stock. During the period between the spinoff in 2015 and early 2018, the value of TEGNA's publicly traded common stock declined approximately 31%, while the S&P Index increased approximately 32%. Thus, according to the complaint, the failure to divest the Plan of all TEGNA stock resulted in an alleged $135 million loss in value to the Plan.

Plan participant Quatrone commenced this action in March 2018 on behalf of himself and a putative class of other Gannett Plan participants, naming as defendants those who he alleged were fiduciaries of the Plan. He alleged that those fiduciaries breached their duties of "diversification" and "prudence," as imposed by ERISA, by failing "to timely liquidate the Plan's significant holdings in TEGNA common stock." The defendants filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state plausible claims under ERISA, and the district court granted the motion. It held that the Gannett Plan's fiduciaries did not breach the duty of diversification because, notwithstanding the undiversified nature of the TEGNA Stock

37

Fund, "the Plan as a whole was comprised of various options for the participants to select." It further held that the fiduciaries were not liable for breach of the prudence duty based on the Supreme Court's decision in *Fifth Third Bancorp v. Dudenhoeffer*, as the risks of holding TEGNA stock were public and the plaintiffs had offered no other basis for a lack-of-prudence claim. The district court also denied Quatrone's motion for leave to amend the complaint, concluding that such amendment would be futile.

From the district court's judgment dated February 13, 2019, Quatrone filed this appeal.

II

In essence, the complaint is grounded on the simple allegation that the Gannett Plan's fiduciaries maintained too long the participants' option to retain their investments in the TEGNA Stock Fund, which had represented at one time over 20% of the Plan's assets. It alleged that the fiduciaries' conduct violated ERISA's duties of diversification, as imposed by 29 U.S.C. § 1104(a)(1)(C), and of prudence, as imposed by § 1104(a)(1)(B). While Quatrone acknowledges that the Gannett Plan included, among its multiple offerings, diverse options, he contends that the duty to diversify operates both at the Plan level and "at the level of individual funds within [the] [P]lan." Based on that contention, he argues that "[i]ncluding a non-diverse, single-stock fund [the TEGNA Stock Fund] in a [P]lan lineup invites exactly the sort of overconcentration that a prudent fiduciary should avoid." In effect, therefore, Quatrone maintains that a defined contribution plan with diverse options cannot include as one option a non-employer, single-stock fund because

38

such inclusion somehow "invites" participants to overconcentrate in that option, thus rendering the entire Plan inadequately diversified.

As the district court explained, the argument makes little sense in the context of a defined contribution plan in which the participants, such as Quatrone, determine the allocation of their contributions. In particular, Quatrone was free to divest himself *entirely* of the TEGNA Stock Fund, but he continued to hold the investment, despite warnings available from public sources, while market forces reduced its value. Then, he filed this action seeking to hold the fiduciaries liable for not promptly forcing him to divest his holdings of the TEGNA Stock Fund. This is not an ERISA problem, nor is it a problem caused by the fiduciaries' failure to diversify. It was the outcome of a free, individualized decision made by each participant who remained invested in the TEGNA Stock Fund. And the district court was correct to recognize this.

The standard of care that ERISA imposes on fiduciaries requires them to "diversify[] the investments *of the plan* so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C) (emphasis added). This duty is imposed with respect to "*the plan*," not with respect to *each investment* offered by the plan. *Id.*; *see also Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) ("[L]egislative history and federal regulations clarify that the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds"); *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 195 (5th Cir. 2020) (explaining that ERISA's diversification duty "looks to a pension plan as a whole, not to

39

each investment option"). Thus, the ERISA duty of diversification requires that a plan's investments be diversified but not that each investment be diversified.

Moreover, the diversification duty under § 1104(a)(1)(C) "imposes obligations on fiduciaries for *defined benefit plans* that are different from those for *defined contribution plans*." *Schweitzer*, 960 F.3d at 196 (emphasis added). Because fiduciaries of a defined benefit plan both choose investments and allocate the plan's assets among them, the duty of diversification requires that their investment choices and the relative allocation of funds among those choices result in proper diversification. But for defined contribution plans, like the Gannett Plan, the fiduciaries' role is limited to selecting the menu of investment options offered to plan participants for their choosing. The individual participants then select how to allocate their investments among those options. Accordingly, fiduciaries of defined contribution plans "need only provide investment options that enable participants to create diversified portfolios." *Id.*

Apparently recognizing these principles, at least to some degree, Quatrone argues that the complaint contains allegations sufficient to establish that "the Plan's heavy investment in the TEGNA Stock Fund caused *the Plan as a whole* to be undiversified for purposes of [§ 1104(a)(1)(C)]." (Emphasis added). Yet, it does not follow from the Plan's concentration in TEGNA stock that the fiduciaries violated their duty to diversify. Rather, the cause of any overconcentration in TEGNA stock was individual Plan participants' decisions to retain their assets in the TEGNA Stock Fund. In short, the complaint provides no basis on which to conclude that the fiduciaries' inclusion of the TEGNA Stock Fund as an option caused the Plan's overall menu of options to be undiversified. Therefore, the

40

complaint failed to state a claim that the fiduciaries neglected to "diversify[] the investments of the plan," as required by § 1104(a)(1)(C).

Of course, if the retention of the TEGNA Stock Fund *as an investment option* was itself imprudent, the defendants would be liable for breach of the prudence duty imposed by § 1104(a)(1)(B). But the complaint does not plausibly allege that, in these circumstances, offering a single-stock fund involving a publicly traded company was imprudent, especially in light of the Supreme Court's decision in *Dudenhoeffer*.

ERISA applies a prudent man's standard of care, requiring that fiduciaries act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). And particularly as relevant in the context of a defined contribution plan, like the Gannett Plan, "[a] fiduciary . . . must exercise prudence *in selecting and retaining available investment options*." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (emphasis added). This is a contextual exercise that requires fiduciaries to evaluate each investment option in light of the other options available to participants and the goals of the plan itself. *See Dudenhoeffer*, 573 U.S. at 425 (noting that the proper inquiry is "context specific"); *see also* 29 C.F.R. § 2550.404a-1(b) (2019) (requiring that fiduciaries give appropriate consideration to relevant facts and circumstances that they know or should know in evaluating each investment to determine whether it is appropriate to further the goals of the plan). But in this case, the complaint provides no contextual facts about the

41

Plan's menu from which to conclude that including the TEGNA Stock Fund on that menu demonstrated a lack of prudence.

Nonetheless, Quatrone attempts to use a slice of language from *DiFelice* to maintain that compliance with ERISA's duty of prudence must be evaluated *exclusively* at the level of each individual fund offered by a plan, without regard to the characteristics of the plan as a whole. And unfortunately, the majority seems to agree. *See ante* at 19–20. Indeed, the majority takes the additional step of extending *DiFelice*'s language to conclude that, for a participant-driven, defined contribution 401(k) plan, "each available fund on a menu must be prudently diversified." *Id.* at 19.

This conclusion not only collapses any meaningful distinction between the separately enumerated duties of diversification and prudence, but it also creates tension with our precedent. Specifically, *DiFelice* explains that to satisfy ERISA's duty of prudence, "a fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." 497 F.3d at 423. But this language cannot be read to mean that, to satisfy the duty of prudence, each individual fund must be diversified — as maintained by Quatrone and the majority. Such a position necessarily leads to the conclusion that no non-employer, single-stock investment option offered under an ERISA plan could ever satisfy the duty of prudence. Indeed, Quatrone's counsel acknowledged that his position would essentially create such a *per se* rule, stating at oral argument that "you cannot" prudently offer a single-company fund in the context of a participant-driven, defined contribution plan. And, by not explaining how plan fiduciaries could ever prudently offer a single-stock, non-employer fund if the duty of prudence indeed

42

requires "each available fund on a menu [to] be prudently diversified," the majority has now adopted that position. *Ante* at 19.

Yet, we have already unequivocally rejected the notion that offering single-stock funds is imprudent *per se* because such a "*per se* approach is directly at odds with our case law and federal regulations interpreting ERISA's duty of prudence." *Tatum*, 761 F.3d at 360; *see also id.* at 367 (rejecting the "contention that it would *necessarily* be imprudent for a fiduciary to maintain an existing single-stock investment in a plan that . . . offers participants a diversified portfolio of investment options"). Thus, allegations regarding the TEGNA Stock Fund's single-stock nature are insufficient to establish that the fiduciaries acted imprudently when they allowed participants to retain their investments in the Fund.

Moreover, TEGNA is a publicly traded stock, meaning that both fiduciaries and plan participants could "rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Dudenhoeffer*, 573 U.S. at 426 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273 (2014)). This means that, "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone" that a stock was excessively risky "are implausible as a general rule, at least in the absence of special circumstances." *Id.* And because Quatrone has pleaded no special circumstances, his allegation that the TEGNA stock's volatility made the inclusion of the TEGNA Stock Fund an imprudent investment simply fails to state a claim in light of *Dudenhoeffer*.

Finally, Quatrone argues that the TEGNA Stock Fund was imprudent because "[t]he sheer size of the Plan's holdings in TEGNA common stock was unreasonable by any

43

measure" and caused the overall Plan to be overconcentrated in one company. Relatedly, he asserts that, when considered alongside the Plan's holdings in the stock of New Gannett, retention of the TEGNA Stock Fund caused the Plan to be overconcentrated in one sector. But that the Plan may have been concentrated in one company or one sector does not reflect a breach of any duty owed by the fiduciaries. Instead, it merely reflects individual Plan participants' decisions as to how to allocate their own investments. And while it might be generally imprudent *for a fiduciary* to invest a large percentage of plan assets in a single security or a single sector, a defined contribution plan is structured such that the plan participants — not the fiduciaries — make the actual investment decisions. In effect, Quatrone's argument ignores the structure of a defined contribution plan and suggests that an investment can become imprudent simply because many plan participants independently decide to allocate their contributions to it. But an investment option's prudence cannot rise or fall based on the number of participants who ultimately decide to invest in (or remain invested in) it.

In sum, other than identifying the single-stock nature of the TEGNA Stock Fund and its asset share relative to other investments offered by the Gannett Plan, Quatrone has pleaded no other facts from which to conclude that the TEGNA Stock Fund was an imprudent investment option. Accordingly, I conclude that Quatrone has failed plausibly to allege that the inclusion of the TEGNA Stock Fund on the menu of diversified options was imprudent.

For these reasons, I would affirm the judgment of the district court dismissing this case for failure to state an ERISA claim.